Joshua P. Davis (SBN 271725)
**BERGER MONTAGUE PC**
59A Montford Avenue
Mill Valley, CA 94941
Telephone: (800) 424-6690
jdavis@bm.net

Brent W. Johnson (*pro hac vice application forthcoming*)
Richard A. Koffman (*pro hac vice application forthcoming*)
Daniel McCuaig (*pro hac vice application forthcoming*)
Daniel H. Silverman (*pro hac vice application forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
bjohnson@cohenmilstein.com
rkoffman@cohenmilstein.com
dmccuaig@cohenmilstein.com
dsilverman@cohenmilstein.com

[Additional Counsel on Signature Page]

*Counsel for Plaintiffs and Proposed Co-Lead Counsel
for Class [Complete List of Parties on Signature Page]*

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

CAM YUEN, ARRIANNA GARCIA, KATHRYN HEBERLING, SUSAN MCVINNEY, SUNNY STIMSON, ELLEN BERMAN, NEIL MURPHY, DENNIS WILD, ANDREA BURY, MIRANDA SMELCER, MARCIA POTTS, SHERYL EMERSON, CHRYSTA CATALDO, MARLENA GIGA, GINA GIORGIO, MICHELLE CARPENTER, VALERIE HITZ, SHAVONNA ARMSTRONG, HILARY ALLRED, MELISSA MARSHALL, JOSEPH DUNCAN, AND DAWN REYNOSA, on behalf of themselves and all others similarly situated,

Plaintiffs,

Case No:  3:22-cv-04297

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

CLASS ACTION

vs.

IDEXX LABORATORIES, INC. and IDEXX
DISTRIBUTION, INC.,

Defendants.

Plaintiffs Cam Yuen, Arrianna Garcia, Kathryn Heberling, Susan McVinney, Sunny Stimson, Ellen Berman, Neil Murphy, Dennis Wild, Andrea Bury, Miranda Smelcer, Marcia Potts, Sheryl Emerson, Chrysta Cataldo, Marlena Giga, Gina Giorgio, Michelle Carpenter, Valerie Hitz, Shavonna Armstrong, Hilary Allred, Melissa Marshall, Joseph Duncan, and Dawn Reynosa ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure against defendants IDEXX Laboratories, Inc. and IDEXX Distribution, Inc. (collectively, "IDEXX" or "Defendants"). IDEXX's anticompetitive behavior has caused pet owners like Plaintiffs and other similarly situated indirect purchasers to pay artificially inflated prices for in-house point-of-care ("POC") analyzers, consumables, and single-use rapid test kits, which are components of in-house POC diagnostic tests that veterinary practices use to treat family pets and other companion animal patients. Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities in Repealer Jurisdictions who indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of IDEXX POC analyzers, consumables, or single-use rapid test kits for companion animals, other than for resale, at any time during the period from July 26, 2018 through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period"). A Repealer Jurisdiction is a state or district that has repealed the bar on indirect purchaser plaintiffs recovering under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and includes: Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. Plaintiffs bring this action against Defendants for injunctive

relief under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and for treble damages under the antitrust laws and consumer protection laws of the several states, and demand a trial by jury.

## I. **NATURE OF THE ACTION**

1.     Like thousands of other pet owners in the United States, Plaintiffs Cam Yuen, Arrianna Garcia, Kathryn Heberling, Susan McVinney, Sunny Stimson, Ellen Berman, Neil Murphy, Dennis Wild, Andrea Bury, Miranda Smelcer, Marcia Potts, Sheryl Emerson, Chrysta Cataldo, Marlena Giga, Gina Giorgio, Michelle Carpenter, Valerie Hitz, Shavonna Armstrong, Hilary Allred, Melissa Marshall, Joseph Duncan, and Dawn Reynosa ("Plaintiffs") and those similarly situated rely on in-house point-of-care ("POC") diagnostic laboratory tests provided by their veterinary practices to treat family pets and other companion animal patients when fast test results are needed. Such tests are critical in providing timely care by allowing veterinary practices to test, diagnose, and treat certain conditions, such as heart worm, during a single office visit, and they are often used when patients require surgery or other emergency intervention.

2.     IDEXX is a multinational corporation that develops, manufactures, and distributes a range of products across various veterinary, livestock, and water testing markets. IDEXX is the nation's dominant provider of "POC Diagnostic Products" comprised of (a) POC diagnostic testing devices or instruments, also referred to as "analyzers," (b) supplies used in conjunction with POC diagnostic testing, such as, *e.g.*, reagents, slides, etc. (referred to as "consumables"), and (c) single-use rapid test kits used by veterinarians to run critical in-house laboratory tests (referred to as "single-use rapid test kits"). POC Diagnostic Products provide real-time results that cannot be obtained through other kinds of products, such as services offered by outside reference labs.

3.     IDEXX has a greater than 70% share of sales in the United States in the POC Diagnostic Products market and submarkets for (a) analyzers and their compatible consumables, and (b) single-use rapid test kits (the "Relevant Market and Submarkets"). IDEXX has repeatedly violated the antitrust laws to maintain and enhance its dominance.

4.     IDEXX achieved and protected its dominant position in the Relevant Market and Submarkets through illegal long-term exclusive agreements with veterinary product distributors to block rivals from competing in the Relevant Market and Submarkets by cutting them off from

distributors, which, prior to 2013, were the primary means of selling POC Diagnostic Products to thousands of small veterinary practices around the country. The U.S. Federal Trade Commission ("FTC") ended that anticompetitive scheme with a decision and order, dated February 11, 2013 (the "FTC Order"), directing IDEXX to discontinue its use of exclusive distribution agreements with the three national distributors, and requiring that future distribution agreements be non-exclusive and capped at two years (with a one-year renewal). The FTC further prohibited IDEXX from withholding or threatening to withhold its products from the distributors or retaliating against them for carrying POC Diagnostic Products made by IDEXX's rivals.

5.      Instead of then competing on the merits in the market for POC Diagnostic Products as contemplated by the FTC Order though, IDEXX upended its entire distribution network—cutting loose the distributors it previously had relied on—in order to maintain exclusive restraints in the Relevant Market and Submarkets without violating the letter of the FTC's Order. IDEXX Laboratories described this abrupt pivot in its 2015 Form 10-K filed with the SEC: "effective January 1, 2015 we transitioned to an all-direct sales strategy in the U.S. and did not renew our current annual contracts with our U.S. distribution partners. Under this approach, we take orders, ship product, invoice and receive payment for all single-use rapid test kits and instrument consumables in the U.S., aligning with our direct model for instruments, reference laboratory services, and other [companion animal group] products and services."[1]

6.      After cutting out the distributors, IDEXX proceeded to lock the vast majority of veterinary practices into long-term exclusive agreements, thereby substantially foreclosing competition, and maintaining and enhancing its monopoly power over POC Diagnostic Products. As a result of this anticompetitive scheme, IDEXX has been able to impose supracompetitive prices for POC Diagnostic Products on Plaintiffs and members of the Class (defined below).

7.      IDEXX's contracts are exclusive and long-term, initially running for six-year terms. They include steep purchase requirements and equally steep "disloyalty" penalty provisions, all of which are scaled to the practice's individual purchase history to optimize their lock-in effects. And

---

[1] IDEXX christened this strategy reversal its "US Go Direct" program and began it in 2014.

IDEXX further lengthens its already-long-term exclusive contracts by including automatic renewal provisions in some contracts and extending most others well in advance of expiration, thus ensuring that the exclusive arrangements run longer—often much longer—than even the initial six-year term. Additionally, because practices that fall behind on the purchase requirements face steep penalties, IDEXX is able to leverage that indebtedness into even greater customer lock-in by allowing payments in arrears to be extended over a longer period in exchange for the practices' agreement to extend the terms of their exclusive IDEXX contracts time and again. As a result, once practices sign the long-term deals with IDEXX, many find themselves unable to terminate them, ever, without risking ruinous financial penalties, and thus the exclusive contracts often extend in perpetuity—thereby blocking rivals and potential rivals from accessing the vast majority of customers.

8.      IDEXX's practice of scaling the financial penalties for giving POC Diagnostic Products business to any company other than IDEXX to the size of each individual practice means that a veterinary practice that tries to extricate itself from IDEXX's six-year exclusive contract faces business-crippling penalties as high as six-years' worth of the practice's typical spending on POC diagnostic testing. For example, with annual minimum spend amounts set anywhere from $20,000 per year to $95,000 per year or more, veterinary practices can be subjected to penalties totaling over half a million dollars, which these small businesses simply cannot absorb. The mere threat of such high penalties is typically enough to prevent them from considering switching to rival POC Diagnostic Products options, either during the six-year exclusive term or after. Likewise, the magnitude of IDEXX's penalties and their link to the amount of each practice's POC Diagnostic Product purchases ensures that it never will be economical for any of IDEXX's rivals to absorb some or all of a veterinary practice's switching costs in order to win the practice's business away from IDEXX.

9.      Further, for those veterinary practices that cannot meet the contractual requirements, IDEXX strictly enforces its contracts through aggressive collection actions. The specter of such enforcement actions are not mere threats that IDEXX uses to browbeat veterinary practices into meeting their minimum spend requirements. To the contrary, IDEXX has brought numerous collection actions against veterinary practices around the country, and those actions are always brought in federal court in Maine under the choice of venue provisions in IDEXX's standard exclusionary contracts.

Those contracts also include a "loser pays" provision, threatening to force a veterinary practice that unsuccessfully tries to stand up to IDEXX's litigious tactics to pay IDEXX's legal fees and court costs, making the litigation risk to these small businesses potentially existential.

10.     IDEXX also designs its products to ensure that veterinary practices will not use more than one brand of analyzer at a time. It is impractical for a practice to train staff on the simultaneous use and upkeep of different brands of analyzers, which would require the practice to integrate results from those different machines into the veterinary practice's practice information management system ("PIMS") used for patient files. IDEXX designed its popular Cornerstone PIMS software to be compatible only with IDEXX analyzers, which further makes mixing and matching analyzer brands unworkable for those practices that use Cornerstone and increases their costs of switching away from IDEXX. Likewise, IDEXX designed its analyzers to accept only IDEXX consumables, further locking in its customers.

11.     IDEXX's competitors are thus foreclosed from having any financially viable opportunity to compete for the business of the vast majority of veterinary practices that purchase POC Diagnostic Products. Indeed, as a result of IDEXX's tactics, including renewing contracts before they reach the end of their terms, out of the 16,000 to 20,000 veterinary practices in the United States that purchase POC Diagnostic Products from IDEXX, less than 2.5% are ever able to get out from under IDEXX's thumb in any given year.

12.     Having been barred by the FTC from blocking rivals' access to distributors, IDEXX turned to an even more direct and effective route for foreclosing competition: the above-described web of long-term exclusive contracts directly with veterinary practices across the United States that, together, substantially foreclose POC Diagnostic Product rivals' access to veterinary practices themselves.

13.     In short, IDEXX used its dominant position in the Relevant Market and Submarkets to cause veterinary practices to enter into long-term exclusive contracts with baseline spending requirements that require each practice to buy its analyzer and all of the associated consumables (which must be used with IDEXX analyzers) from IDEXX for the duration of the agreement. These

agreements also frequently included IDEXX's single-use rapid test kits and Reference Lab Services (defined below) among the products covered by the minimum spend requirements.

14.     IDEXX's scheme locked veterinary practices into buying all or virtually all their POC Diagnostic Products from IDEXX to avoid the severe financial penalties that IDEXX otherwise imposed. As part of its scheme, IDEXX structured the exclusive agreements so that if a practice failed to meet the minimum spending requirements or sought to exit the long-term agreements before expiration, IDEXX would impose sufficiently large financial penalties to make it economically impossible for the practice to switch to a rival. Once ensnared in an IDEXX contract, a veterinary practice is stuck with the following choices: either continue to buy exclusively from IDEXX or go out of business.

15.     Through the exclusive dealing scheme alleged herein, IDEXX has substantially foreclosed competition in the Relevant Market and Submarkets, and thereby maintained and enhanced its dominant position and monopoly power. IDEXX's scheme has made the cost of switching to IDEXX's rivals to buy POC Diagnostic Products prohibitively expensive for most veterinary practices, and has thereby made it impossible, or nearly so, for IDEXX's actual or potential competitors to compete for market share.

16.     IDEXX's anticompetitive tactics have been shockingly effective. Even with the FTC shutting the door on IDEXX's use of long-term exclusive agreements with distributors, IDEXX's pivot to long-term exclusive agreements with veterinary practices has allowed it to prevent all but a small handful of its customers to reach the end of their exclusive agreements and switch to a competitor. IDEXX has thereby retained over 96% of its customers throughout the period relevant to this Complaint—approaching 100% retention today—even while consistently and persistently raising prices.

17.     IDEXX's anticompetitive conduct harmed Plaintiffs and those similarly situated as persons and entities who indirectly purchased IDEXX's POC Diagnostic Products ("IDEXX POC Diagnostic Products"). Plaintiffs and those similarly situated did not and do not purchase POC Diagnostic Products directly from IDEXX itself, but rather from veterinarians and veterinary practices who purchase directly from IDEXX and re-sell those products.

18.     Because IDEXX has prevented actual or potential rivals from gaining a foothold in the Relevant Market and Submarkets, it has eliminated or impaired the price discipline that would come from free and fair competition. As a result, IDEXX has charged, and continues to charge, supracompetitive prices for POC Diagnostic Products. Those supracompetitive prices are then passed on by direct purchasers to Plaintiffs and those similarly situated. As a result, Plaintiffs and those similarly situated have paid artificially inflated prices for IDEXX POC Diagnostic Products, and they will continue to do so until IDEXX's anticompetitive conduct ends and competition is restored in the Relevant Market and Submarkets.

## II.  JURISDICTION, VENUE, AND INTERSTATE COMMERCE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of the class; and at least one member of the class is a citizen of a state different from that of one of the Defendants.

20.     In the alternative, the Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2. Plaintiffs request declaratory and equitable relief and seek to recover overcharges and treble damages for injuries sustained by Plaintiffs and the Class resulting from Defendants' anticompetitive agreements and unlawful foreclosure of competition in the Relevant Market and Submarkets that maintained and enhanced Defendants' dominant position and monopoly power. Given that Plaintiffs seek declaratory and equitable relief for these violations of the Clayton Act and the Sherman Antitrust Act, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court possesses supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

21.     Venue is proper in this Court pursuant to, among other statutes, § 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because IDEXX regularly transacts business within this district, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a

substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

22.     Defendants' POC Diagnostic Products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce in the United States.

### III.  DIVISIONAL ASSIGNMENT

23.     Assignment is proper to the San Francisco or Oakland Division of this District under Local Rule 3-2(c)-(e), because Plaintiff Cam Yuen resides and purchases IDEXX products in Berkeley, California and a substantial part of the events giving rise to Plaintiffs' claims occurred in Alameda County. Under Local Rule 3-2(d), "all civil actions that arise in the count[y] of Alameda . . . shall be assigned to the San Francisco Division or the Oakland Division."

### IV.  PARTIES

24.     Plaintiff Cam Yuen is a resident of Berkeley, California and a citizen of the United States. Throughout the Class Period defined below, Ms. Yuen, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Ms. Yuen has purchased IDEXX POC Diagnostic Products in California. The veterinary practices pass on to Ms. Yuen and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Yuen suffered antitrust injury as a result of the violations alleged in this Complaint.

25.     Plaintiff Arrianna Garcia is a resident of San Jose, California and a citizen of the United States. Throughout the Class Period defined below, Ms. Garcia, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Ms. Garcia has purchased IDEXX POC Diagnostic Products in California. The veterinary practices pass on to Ms. Garcia and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Garcia suffered antitrust injury as a result of the violations alleged in this Complaint.

26.     Plaintiff Kathryn Heberling is a resident of Gustine, California and a citizen of the United States. Throughout the Class Period defined below, Ms. Heberling, a pet owner, has purchased

IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Ms. Heberling has purchased IDEXX POC Diagnostic Products in California. The veterinary practices pass on to Ms. Heberling and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Heberling suffered antitrust injury as a result of the violations alleged in this Complaint.

27.     Plaintiff Susan McVinney is a resident of Sun City, Arizona and a citizen of the United States. Throughout the Class Period defined below, Ms. McVinney, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Ms. McVinney has purchased IDEXX POC Diagnostic Products in Arizona. The veterinary practices pass on to Ms. McVinney and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. McVinney suffered antitrust injury as a result of the violations alleged in this Complaint.

28.     Plaintiff Sunny Stimson is a resident of Chandler, Arizona and a citizen of the United States. Throughout the Class Period defined below, Ms. Stimson, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Ms. Stimson has purchased IDEXX POC Diagnostic Products in Arizona. The veterinary practices pass on to Ms. Stimson and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Stimson suffered antitrust injury as a result of the violations alleged in this Complaint.

29.     Plaintiff Ellen Berman is a resident of Port Saint Lucie, Florida and a citizen of the United States. Throughout the Class Period defined below, Ms. Berman, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Ms. Berman has purchased IDEXX POC Diagnostic Products in Florida. The veterinary practices pass on to Ms. Berman and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Berman suffered antitrust injury as a result of the violations alleged in this Complaint.

30.     Plaintiff Neil Murphy is a resident of Orlando, Florida and a citizen of the United States. Throughout the Class Period defined below, Mr. Murphy, a pet owner, has purchased IDEXX

POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Mr. Murphy has purchased IDEXX POC Diagnostic Products in Florida. The veterinary practices pass on to Mr. Murphy and other Class members the supracompetitive prices of each POC Diagnostic Product. Mr. Murphy suffered antitrust injury as a result of the violations alleged in this Complaint.

31.     Plaintiff Dennis Wild is a resident of Wilmington, Illinois and a citizen of the United States. Throughout the Class Period defined below, Mr. Wild, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Mr. Wild has purchased IDEXX POC Diagnostic Products in Illinois. The veterinary practices pass on to Mr. Wild and other Class members the supracompetitive prices of each POC Diagnostic Product. Mr. Wild suffered antitrust injury as a result of the violations alleged in this Complaint.

32.     Plaintiff Andrea Bury is a resident of Rosedale, Maryland and a citizen of the United States. Throughout the Class Period defined below, Ms. Bury, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits from veterinary practices. Ms. Bury has purchased IDEXX POC Diagnostic Products in Maryland. The veterinary practices pass on to Ms. Bury and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Bury suffered antitrust injury as a result of the violations alleged in this Complaint.

33.     Plaintiff Miranda Smelcer is a resident of Bridgewater, Massachusetts and a citizen of the United States. Throughout the Class Period defined below, Ms. Smelcer, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits from veterinary practices. Ms. Smelcer has purchased IDEXX POC Diagnostic Products in Massachusetts. The veterinary practices pass on to Ms. Smelcer and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Smelcer suffered antitrust injury as a result of the violations alleged in this Complaint.

34.     Plaintiff Marcia Potts is a resident of Grand Ledge, Michigan and a citizen of the United States. Throughout the Class Period defined below, Ms. Potts, a pet owner, has purchased IDEXX

POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits from veterinary practices. Ms. Potts has purchased IDEXX POC Diagnostic Products in Michigan. The veterinary practices pass on to Ms. Potts and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Potts suffered antitrust injury as a result of the violations alleged in this Complaint.

35.     Plaintiff Sheryl Emerson is a resident of Hannibal, Missouri and a citizen of the United States. Throughout the Class Period defined below, Ms. Emerson, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Ms. Emerson has purchased IDEXX POC Diagnostic Products in Missouri. The veterinary practices pass on to Ms. Emerson and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Emerson suffered antitrust injury as a result of the violations alleged in this Complaint.

36.     Plaintiff Chrysta Cataldo is a resident of Massapequa Park, New York and a citizen of the United States. Throughout the Class Period defined below, Ms. Cataldo, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits from veterinary practices. Ms. Cataldo has purchased IDEXX POC Diagnostic Products in New York. The veterinary practices pass on to Ms. Cataldo and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Cataldo suffered antitrust injury as a result of the violations alleged in this Complaint.

37.     Plaintiff Marlena Giga is a resident of Washingtonville, New York and a citizen of the United States. Throughout the Class Period defined below, Ms. Giga, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits from veterinary practices. Ms. Giga has purchased IDEXX POC Diagnostic Products in New York. The veterinary practices pass on to Ms. Giga and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Giga suffered antitrust injury as a result of the violations alleged in this Complaint.

38.     Plaintiff Gina Giorgio is a resident of North Scituate, Rhode Island and a citizen of the United States. Throughout the Class Period defined below, Ms. Giorgio, a pet owner, has purchased

IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Ms. Giorgio has purchased IDEXX POC Diagnostic Products in Rhode Island. The veterinary practices pass on to Ms. Giorgio and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Giorgio suffered antitrust injury as a result of the violations alleged in this Complaint.

39.     Plaintiff Michelle Carpenter is a resident of Irmo, South Carolina and a citizen of the United States. Throughout the Class Period defined below, Ms. Carpenter, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Ms. Carpenter has purchased IDEXX POC Diagnostic Products in South Carolina. The veterinary practices pass on to Ms. Carpenter and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Carpenter suffered antitrust injury as a result of the violations alleged in this Complaint.

40.     Plaintiff Valerie Hitz is a resident of Myrtle Beach, South Carolina and a citizen of the United States. Throughout the Class Period defined below, Ms. Hitz, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits from veterinary practices. Ms. Hitz has purchased IDEXX POC Diagnostic Products in Illinois. The veterinary practices pass on to Ms. Hitz and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Hitz suffered antitrust injury as a result of the violations alleged in this Complaint.

41.     Plaintiff Shavonna Armstrong is a resident of Goodlettsville, Tennessee and a citizen of the United States. Throughout the Class Period defined below, Ms. Armstrong, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits from veterinary practices. Ms. Armstrong has purchased IDEXX POC Diagnostic Products in Tennessee. The veterinary practices pass on to Ms. Armstrong and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Armstrong suffered antitrust injury as a result of the violations alleged in this Complaint.

42.     Plaintiff Hilary Allred is a resident of Eagle Mountain, Utah and a citizen of the United States. Throughout the Class Period defined below, Ms. Allred, a pet owner, has purchased IDEXX

POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Ms. Allred has purchased IDEXX POC Diagnostic Products in Utah. The veterinary practices pass on to Ms. Allred and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Allred suffered antitrust injury as a result of the violations alleged in this Complaint.

43.     Plaintiff Melissa Marshall is a resident of Wheeling, West Virginia and a citizen of the United States. Throughout the Class Period defined below, Ms. Marshall, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Ms. Marshall has purchased IDEXX POC Diagnostic Products in West Virginia. The veterinary practices pass on to Ms. Marshall and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Marshall suffered antitrust injury as a result of the violations alleged in this Complaint.

44.     Plaintiff Joseph Duncan is a resident of Milwaukee, Wisconsin and a citizen of the United States. Throughout the Class Period defined below, Mr. Duncan, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices. Mr. Duncan has purchased IDEXX POC Diagnostic Products in Wisconsin. The veterinary practices pass on to Mr. Duncan and other Class members the supracompetitive prices of each POC Diagnostic Product. Mr. Duncan suffered antitrust injury as a result of the violations alleged in this Complaint.

45.     Plaintiff Dawn Reynosa is a resident of Stevens Point, Wisconsin and a citizen of the United States. Throughout the Class Period defined below, Ms. Reynosa, a pet owner, has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits from veterinary practices. Ms. Reynosa has purchased IDEXX POC Diagnostic Products in Wisconsin. The veterinary practices pass on to Ms. Reynosa and other Class members the supracompetitive prices of each POC Diagnostic Product. Ms. Reynosa suffered antitrust injury as a result of the violations alleged in this Complaint.

46.     Defendant IDEXX Laboratories, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One IDEXX Drive, Westbrook, Maine.

47.     Defendant IDEXX Distribution, Inc. is a corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business also located at One IDEXX Drive, Westbrook, Maine.

48.     IDEXX Distribution is a wholly owned subsidiary of IDEXX Laboratories and the two entities share corporate officers. Brian P. McKeon serves as the president, treasurer, CEO, CFO, and director of IDEXX Distribution. He also serves as the CFO and treasurer of IDEXX Laboratories. Jonathan Jay Mazelsky serves as a director of IDEXX Distribution and the president and CEO of IDEXX Laboratories. IDEXX Distribution also shares corporate offices with IDEXX Laboratories, as both are headquartered at One IDEXX Drive, Westbrook, Maine.

49.     IDEXX Laboratories and IDEXX Distribution operate as a single unit in the veterinary space with IDEXX Laboratories referring to IDEXX Distribution as "IDEXX," "Company," "registrant," "we," "us," and "our" in its Securities and Exchange Commission ("SEC") filings and consolidating IDEXX Distribution under U.S. GAAP in its SEC filings.

50.     All of IDEXX Distribution's profits are reported in IDEXX Laboratories' financial statements as if they were IDEXX Laboratories' profits. Indeed, IDEXX Laboratories does not even recognize profits on products when the products are passed to IDEXX Distribution, and instead sales are recognized only once products have been sold by IDEXX Distribution to veterinarians and other direct purchasers.

51.     IDEXX Laboratories directs the corporate strategy of IDEXX Distribution. In its 2015 Form 10-K filed with the SEC, IDEXX Laboratories described its shift in strategy from selling products through distributors to selling directly to veterinary practices. IDEXX undertook this change as a result of the FTC's Order that attempted to curtail its anticompetitive conduct at the distribution level. As the 10-K states: "effective January 1, 2015 we transitioned to an all-direct sales strategy in the U.S. and did not renew our current annual contracts with our U.S. distribution partners. Under this approach, we take orders, ship product, invoice and receive payment for all single-use rapid test kits

and instrument consumables in the U.S., aligning with our direct model for instruments, reference laboratory services, and other [companion animal group] products and services." In doing so, IDEXX Laboratories made no distinction between IDEXX Laboratories and IDEXX Distribution. Further, IDEXX Distribution does not perform any services other than those carried out on behalf of IDEXX Laboratories in the veterinary space.

52.     Further, IDEXX Laboratories describes the anticompetitive "customer loyalty programs," discussed below and executed by IDEXX Distribution, as its own in its SEC filings. And IDEXX Laboratories and IDEXX Distribution have been co-plaintiffs in lawsuits against veterinary practices seeking to recover the full annual minimum commitments under the long-term exclusive agreements that form part of the anticompetitive scheme alleged in this case. In those lawsuits, IDEXX Laboratories and IDEXX Distribution present themselves as a single wronged party and seek a single damages award unallocated between themselves.

53.     The IDEXX Laboratory Diagnostic Agreements discussed in more detail below are on behalf of IDEXX Distribution and its affiliates (*i.e.*, IDEXX Laboratories) and include the insignia of IDEXX Laboratories. Similarly, the IDEXX 360 Agreements discussed in more detail below are on behalf of IDEXX Distribution, bear the insignia of IDEXX Laboratories, explain that IDEXX Distribution is an affiliate of IDEXX Laboratories, and incorporate the "One-IDEXX Master Terms," which dictate that all notices under the agreement be addressed to IDEXX Laboratories at the address it shares with IDEXX Distribution. Invoices for items purchased as required under the long-term agreements challenged as part of the anticompetitive scheme herein come from IDEXX Laboratories, while payments are directed to IDEXX Distribution.

54.     In short, IDEXX Laboratories controls, dictates, and encourages IDEXX Distribution's actions concerning the long-term exclusive agreements used by IDEXX to perpetuate the anticompetitive scheme. Moreover, the two entities work as a single unit in exercising monopoly power over the Relevant Market and Submarkets.

55.     The FTC's Order stemming from its 2012 investigation of IDEXX's anticompetitive conduct in the Relevant Market and Submarkets applies equally to IDEXX Laboratories and IDEXX Distribution as it defines "'Respondent' or 'Respondent IDEXX' [to] mean[] IDEXX Laboratories,

Inc.; its directors, officers, employees, agents, and representatives; its successors and assigns; its joint ventures, subsidiaries, divisions, groups and affiliates controlled by IDEXX Laboratories (including, but not limited to IDEXX Distribution, Inc.), and the respective directors, officers, employees, agents, representatives, successors and assigns of each."

## V. FACTS

### A. Background

56.     IDEXX operates in the veterinary space, including providing: (a) POC Diagnostic Products; (b) veterinary reference laboratory diagnostic and consulting services ("Reference Lab Services"); and (c) veterinary practice information management systems. These operations are under the umbrella of the Companion Animal Group at IDEXX. IDEXX's U.S. Companion Animal Group revenues were $2.38 Billion in 2020 and $2.88 Billion in 2021.

57.     POC diagnostic testing provides veterinary practices and pet owners the medical advantage and convenience of on-the-spot results. For some diseases or conditions, veterinarians perform POC diagnostic chemistry, hematology, immunoassay, urinalysis, and coagulation testing at veterinary clinics with devices or instruments also referred to as "analyzers." Those analyzers require chemical reagents, slides and other single-use products to run the desired tests. Those single-use products used to run tests on POC analyzers are referred to as "consumables." Analyzers must be used with company-specific consumables, which are proprietary to a given machine and manufacturer. In other words, IDEXX's analyzers only work with IDEXX's consumables and the same is true for analyzers sold by other suppliers in the market. To test for certain diseases and conditions, veterinarians perform POC tests using single-use rapid test kits that do not require the use of an analyzer, but likewise provide quick, accurate, and convenient POC diagnostic test results.

58.     IDEXX's POC Diagnostic Products include analyzers in its IDEXX VetLab suite of in-clinic chemistry, hematology, immunoassay, urinalysis, and coagulation tests, the associated consumable products that are required to run the tests necessary to provide real time lab results using IDEXX's analyzers, and single-use rapid test kits, which IDEXX has branded "SNAP."

59.     POC Diagnostic Products include the POC analyzers and associated consumables used to run tests with those analyzers, as well as the single-use rapid test kits. Consumables and single-use

rapid tests kits account for most of the sales revenue in the market. For instance, IDEXX's reported revenues from the sale of consumables and single-use rapid test kits in 2020 ($1,077,394,000) and 2021 ($1,303,633,000) were well over eight times higher than its revenues from analyzers in those years ($108,590,000 and $149,140,000 respectively). And IDEXX estimates that between 2022-25 it will receive approximately $2.9 billion from sales of consumables to veterinary practices under its long-term exclusive agreements.[2]

60.    There are two other entities that offer POC diagnostic analyzers, consumables, and single-use rapid test kits to veterinary practices in the United States: Zoetis, Inc. ("Zoetis") and Heska Corporation ("Heska"). As is the case with IDEXX, Zoetis analyzers use only Zoetis consumables, and the same is true of the analyzers sold by Heska.

61.    In addition to POC Diagnostic Products, IDEXX sells Reference Lab and related consulting services to veterinary practices (*i.e.*, services referred to an outside lab). Reference Labs are off-site facilities that process tests that are more complicated, often requiring pathologists to analyze the test results, or otherwise cannot be completed at the veterinary practice's office. Depending on the type of test, the results from Reference Lab tests are not instantaneous, and may take up to several days after the submission of the sample to the Reference Lab to be completed.

62.    IDEXX also sells PIMS software called Cornerstone. PIMS software enables veterinary practices to incorporate lab test results from POC analyzers or Reference Lab Services directly into a patient's file and then allows the veterinary practice to access the results electronically. IDEXX designed Cornerstone to allow direct importation of test results only from IDEXX analyzers. IDEXX also sells other PIMS software, including ezyVet, Neo, and DVMAX, all of which integrate with IDEXX's VetLab Station and allow veterinary practices to import test results from IDEXX analyzers directly into the system.

---

[2] In fact, in 2020, IDEXX reported that sales of consumables and single-use rapid test kits accounted for about 35% and 11%, respectively, of the company's total net revenue in the companion animal segment, while analyzer sales accounted for only about 5%.

**B.    Monopoly Power and Market Definition**

63.    Insofar as Plaintiffs are required to prove monopoly power circumstantially by first defining a relevant product market, the relevant antitrust market here is the market for the sale of in-clinic POC Diagnostic Products, which includes analyzers, consumables, and single-use rapid test kits (the "POC Diagnostic Products market"). Within the broader POC Diagnostic Products market are two distinct submarkets, namely (a) the sale of POC Diagnostic analyzers and the consumables used to run tests on the analyzer machines (the "Analyzer & Consumables submarket"), and (b) the sale of single-use rapid test kits (the "Rapid Test Kit submarket"). The POC Diagnostic Products market, Analyzer & Consumables submarket, and Rapid Test Kit submarket are collectively referred to as the "Relevant Market and Submarkets."

### i.  POC Diagnostic Products Market

64.    At all times relevant to this Complaint, IDEXX had monopoly power in the market for POC Diagnostic Products in the United States. It had the power to maintain the price of POC Diagnostic Products at supracompetitive levels profitably and without losing substantial sales.

65.    POC Diagnostic Products are designed for in-clinic testing of biological samples. POC Diagnostic Products include single-use rapid test kits, and diagnostic analyzers and their associated single-use products (consumables), which are the chemical reagents necessary for each test and are proprietary to a given machine and manufacturer. The POC analyzers can be used to run tests only with compatible consumables sold by the same entity, and consumables can be used to run tests only on corresponding analyzers. On information and belief, no entity has attempted to sell consumables for use with diagnostic analyzers that are not sold by that entity.

66.    The in-clinic laboratory diagnostic testing conducted using POC Diagnostic Products allows for rapid in-office testing, including in support of surgical procedures, during emergencies, and for diagnoses of conditions that may require the veterinarians to perform follow-up testing or dispense or prescribe medicine as soon as possible after the results have been received. Reference Lab Services, on the other hand, take days for results to come back and typically require pathologists to analyze the results of the test.

67.     For those conditions or diseases that can be diagnosed at the POC with an analyzer (and its consumables) or a single-use rapid test kit, other forms of diagnostic testing, particularly those not available for on-the-spot diagnosis, are not substitutable, and thus a small but significant non-transitory increase in price of POC Diagnostic Products will not cause a sufficient number of veterinarians to switch to non-POC diagnostic products or services to make such a price increase unprofitable. That is, POC Diagnostic Products do not exhibit significant positive cross-elasticity of demand with respect to price with products that are not in the POC Diagnostic Products market.

68.     The FTC agrees. As the FTC explained in defining the relevant product market in which to evaluate IDEXX's previous exclusionary conduct involving similar products as the development, manufacture, and sale of POC Diagnostic Products: "[t]there are no close substitutes for POC Diagnostic Products. Although veterinary practices can purchase some diagnostic services by sending specimens to outside laboratories, POC testing provides state-of-the-art diagnostics. Veterinarians value faster results, particularly when testing is associated with emergencies, pre-surgery, and for diagnoses of conditions that may require the veterinarians to perform follow-up testing or dispense or prescribe medicine as soon as possible after the results have been received." *In the Matter of IDEXX Laboratories, Inc.* (Docket No. C-4383), Complaint ¶ 14 ("FTC Complaint").

69.     In 2012, the FTC determined that "IDEXX has monopoly power in the POC Diagnostic Products market" and that "IDEXX's share of the relevant market has been at least 70% during each of the past five years (2006-2011). No other firm had more than a 20% share of the relevant market in those same five years."  FTC Complaint ¶ 15.

70.     Since then, IDEXX has maintained or grown its monopoly power in the POC Diagnostic Products market. IDEXX has used exclusionary conduct to maintain or increase its dominant share of the POC Diagnostic Products market and to lock in virtually all of its customers—a nearly 100% retention rate.

71.     Neither Zoetis nor Heska has had more than a 10% to 15% share of the POC Diagnostic Products market at any time relevant to the claims alleged in this Complaint.

72.     IDEXX's anticompetitive conduct as alleged herein has constrained Zoetis and Heska's ability to effectively compete for customers, and thus neither has been able to increase its relatively

small respective share of the Relevant Market and Submarkets during the entire period relevant to this Complaint.

73.    As alleged above, at all times relevant to this Complaint, IDEXX has possessed monopoly power—the ability to raise prices significantly above competitive levels without losing sufficient sales in the POC Diagnostic Products market to make such price inflation unprofitable.

74.    As a result, IDEXX has sold its POC Diagnostic Products, including those products sold in the Analyzer & Consumables and Rapid Test Kit submarkets, at prices well in excess of marginal costs, and in excess of the prices that would have prevailed absent the challenged anticompetitive conduct, and enjoyed high profit margins, particularly on consumables. Indeed, IDEXX bragged in one of its 2021 quarterly reports that it had realized a company-wide "310 basis point increase in [its] gross profit margin," due in part to "the net benefit of price increases in [its Companion Animal Group] Diagnostics recurring revenue portfolio." IDEXX's gross profit margin increase in its Companion Animal Group segment was even higher, at 360 basis points.

### ii. Analyzer & Consumables Submarket

75.    As explained above, within the POC Diagnostic Products market, POC diagnostic testing can be conducted using analyzers (with consumables) and/or single-use rapid test kits. But tests using analyzers and consumables diagnose conditions that are different from the conditions diagnosed using single-use rapid test kits. For that reason, a small but significant non-transitory increase in pricing of analyzers and consumables will not cause a sufficient number of veterinarians to switch to other diagnostic testing products, including single-use rapid test kits, to make such a price increase unprofitable. Thus, products in the Analyzer & Consumables submarket do not exhibit significant positive cross-elasticity of demand with respect to price with other diagnostic products, including single-use rapid test kits.

76.    As with the POC Diagnostic Products market, IDEXX has at all relevant times maintained at least 70% share of the Analyzer & Consumables submarket through its exclusionary conduct that has resulted in a nearly 100% retention rate. Neither Zoetis nor Heska has had more than a 10% to 15% share of the Analyzer & Consumables submarket at any time relevant to this Complaint.

77.     IDEXX's anticompetitive conduct as alleged herein has constrained Zoetis and Heska's ability to effectively compete for customers, and thus neither has been able to increase its relatively small respective share of those markets during the entire period relevant to this Complaint.

78.     At all times relevant to this Complaint, IDEXX has possessed monopoly power—the ability to raise prices significantly above competitive levels profitably without losing sufficient sales to make such price inflation unprofitable—in the Analyzer & Consumables submarket.

79.     As a result, IDEXX has sold its analyzers and consumables at prices well in excess of marginal costs, and in excess of the prices that would have prevailed absent the challenged anticompetitive conduct, and enjoyed high profit margins, particularly on consumables.

### iii. Rapid Test Kit Submarket

80.     Similarly, because the POC diagnostic tests conducted using single-use rapid test kits cannot be substituted with in-house diagnostic tests run using analyzers or other products or services, a small but significant non-transitory increase in pricing of single-use rapid tests will not cause a sufficient number of veterinarians to switch to tests run using analyzers and consumables (or any other product or service) to make such a price increase unprofitable. That is, products in the Rapid Test Kit submarket do not exhibit significant positive cross-elasticity of demand with respect to price with products that are not in the Rapid Test Kit Submarket.

81.     As with the POC Diagnostic Products market, and the Analyzer and Consumables submarket, IDEXX has at all relevant times maintained at least a 70% share of the Rapid Test Kit submarket through its exclusionary conduct that has resulted in a nearly 100% retention rate.  Neither Zoetis nor Heska, each of which sells single-use rapid test kits, has had more than a 10% to 15% share of the Rapid Test Kit submarket at any time relevant to this Complaint.

82.     IDEXX's anticompetitive conduct as alleged herein has constrained Zoetis and Heska's ability to effectively compete for customers, and thus neither has been able to increase its relatively small respective share of the Relevant Market and Submarkets during the entire period relevant to this Complaint.

83.     At all times relevant to this Complaint, IDEXX has possessed monopoly power—the ability to raise prices significantly above competitive levels profitably without losing significant sales—in the Rapid Test Kit submarket.

84.     As a result, IDEXX has sold its single-use rapid test kits at prices well in excess of marginal costs, and in excess of the prices that would have prevailed absent the challenged anticompetitive conduct, and has enjoyed very high profit margins.

### iv. High Barriers to Entry

85.     In the Relevant Market and Submarkets, high barriers to entry, including high fixed costs, high risk of failure in the developmental process, and burdensome regulatory requirements, render the entry of new competitors difficult. IDEXX's anticompetitive conduct has made new entry or expansion by rivals or potential rivals effectively impossible.

86.     The design and manufacturing of POC Diagnostic Products—including analyzers, consumables and single-use rapid test kits—require substantial capital investment along with technical expertise and training, which serve as further barriers to entry in the Relevant Market and Submarkets.

87.     These barriers to entry, along with IDEXX's deliberate contracting and design choices intended to raise customer switching costs, have permitted IDEXX to exercise monopoly power in the Relevant Market and Submarkets.

88.     Indeed, Zoetis's experience, discussed more fully below, has shown that even when a global leader in the veterinary space acquires an established POC Diagnostic Product seller like Abaxis, Inc. ("Abaxis") for almost $2 billion, it nevertheless has been unable to make headway in those markets because IDEXX has substantially foreclosed rivals from competing through the anticompetitive conduct alleged herein.

### v. Relevant Geographic Market is the United States

89.     The relevant geographic market for the POC Diagnostic Products market and the Analyzer & Consumables and Rapid Test Kit submarkets is the United States. The exclusive agreements complained of herein are between IDEXX and veterinary practices doing business in the

United States. Sellers of POC analyzers, consumables and single-use rapid test kits, including IDEXX, market and distribute these products throughout the country.

90.     Numerous of the POC Diagnostic Products are subject to regulations for approval and quality from the United States Food and Drug Administration ("FDA") and the United States Department of Agriculture ("USDA"). For example, certain of IDEXX's veterinary diagnostic slide and instrument systems (*i.e.*, analyzers) are veterinary medical devices regulated by the FDA under the Food, Drug and Cosmetics Act. 21 U.S.C. § 301, *et seq*. The FDA also regulates IDEXX's non-licensed rapid assay test kits. Further, the USDA must approve some products before they may be sold in and from the United States. Each lot of such licensed product must be submitted to USDA for test review before release to customers and must be manufactured in USDA-licensed facilities.

91.     Thus, veterinary practices cannot practically purchase many POC Diagnostic Products, including analyzers, consumables and single-use rapid test kits, if they are not manufactured in approved facilities, approved for sale in the United States, or meet the requirements of the FDA. Veterinary practices in the United States therefore cannot rely on POC Diagnostic Products manufactured and sold outside of the United States.

92.     The prices of POC analyzers and consumables in other countries do not affect the market for Analyzers & Consumables in the United States. A small but significant and non-transitory increase in the price of POC analyzers and consumables in the United States would not cause sufficient numbers of veterinary practices to purchase products in the Analyzer & Consumables submarket sold in other countries to make that price increase unprofitable. Likewise, the price of single-use rapid tests kits in other countries does not affect the market for single-use rapid tests kits in the United States. A small but significant and non-transitory increase in the price of single-use rapid tests kits in the United States would not cause enough veterinary practices to purchase single-use rapid tests kits products sold in other countries to make that price increase unprofitable.

93.     It therefore follows that the prices of POC Diagnostic Products in other countries do not affect the market for POC Diagnostic Products in the United States. A small but significant and non-transitory increase in the price of POC Diagnostic Products in the United States would not cause

sufficient veterinary practices to purchase POC Diagnostic Products sold in other countries to make such price increase unprofitable.

### C.   IDEXX's Exclusionary Scheme

94.   IDEXX has maintained and enhanced its monopoly power in the Relevant Market and Submarkets through an anticompetitive scheme that began with transitioning customers that IDEXX had previously acquired through the anticompetitive scheme ended by the FTC to exclusive long-term contracts, often with automatic renewals, covering the vast majority of buyers in the Relevant Market and Submarkets. IDEXX's web of exclusive contracts, and related conduct to enforce and renew such contracts, has foreclosed substantial competition, impaired rivals, and thereby artificially inflated prices Plaintiffs and Class members pay for POC Diagnostic Products.

95.   IDEXX enforces its anticompetitive scheme using a variety of coercive practices, including but not limited to threatening to sue, or in fact suing, geographically dispersed veterinary practice customers in a distant and expensive venue for huge financial penalties to prevent switching to lower-priced alternatives.

### i.   IDEXX Previously Used Exclusive Dealing Contracts to Achieve Monopoly Power in the POC Diagnostic Products Market.

96.   In 2012, the FTC investigated IDEXX's contracting practices concerning the distribution of POC Diagnostic Products mainly through three wholesalers that, at the time, distributed between 75% and 85% of all such products sold to veterinary practices. Specifically, the FTC stated that IDEXX, among other things, had used its dominant position in the POC Diagnostic Products market to enter into long-term exclusive distributor agreements with the large wholesalers that IDEXX used to "bar[] its distributors from carrying any competing POC diagnostic testing products," resulting in IDEXX stifling competition and achieving monopoly power. Indeed, according to the FTC, because of IDEXX's conduct, "distributors [had] no choice but to agree to carry IDEXX's products exclusively to avoid termination by IDEXX."

97.   The FTC's investigation concluded with IDEXX and the FTC entering into a consent agreement, dated November 29, 2012. Through that agreement, the FTC directed IDEXX to discontinue its use of exclusive distribution agreements with the three national distributors, and

required that future distribution agreements be non-exclusive and capped at two years (with a one-year renewal). IDEXX was further prohibited from withholding or threatening to withhold its products from the national wholesalers or retaliating against those wholesalers in the event they were to sell competing products. The FTC Order does not expire until February 2023.

98.     The stated purpose of the FTC's settlement with IDEXX was to "restore competition in the market for diagnostic testing products used by pet veterinarians."

### ii. **IDEXX Shifts its Exclusionary Conduct to Veterinary Practices by Imposing Long-term Exclusivity Agreements that Effectively Cannot be Terminated.**

99.     The FTC settlement did not restore competition. As the ink dried on its consent agreement with the FTC, IDEXX pivoted away from the distributor channel and began imposing long-term exclusive dealing contracts directly on veterinary practices as a means of continuing to lock in its dominant market position, foreclose competition, and willfully maintain and enhance its monopoly power in the Relevant Market and Submarkets.

100.     As part of its new scheme, IDEXX imposed agreements on the vast majority of veterinary practices in the United States which are (a) long term—six years with the potential for auto-renewal, and (b) exclusive, as they include minimum annual purchase amounts often covering a variety of qualifying IDEXX POC Diagnostic Products, including IDEXX POC consumables and single-use rapid test kits, and Reference Lab Services. IDEXX calibrates the required minimum purchase amounts so that they are set at or above the veterinary practice's previous spending levels, making it virtually impossible for veterinary practices to shop elsewhere while meeting their contract's quotas. Further, IDEXX's bundling of POC analyzers and consumables with single-use rapid test kits and Reference Lab Services is an additional mechanism for impairing competitors that do not manufacture and sell all of the products in IDEXX's bundle.

101.     The quotas for purchasing IDEXX consumables are typically in excess of $20,000 and can range as high at $95,000 or more per year depending on the size of the veterinary practice. These minimum purchase requirements are used to determine the penalty paid by veterinary practices that do not meet their quotas, including the penalties that would be imposed on those practices that

switch—or attempt to switch—to an IDEXX rival for some of their POC laboratory testing needs during the term of the agreements. Those penalties can be up to six years' worth of the veterinary practice's expected spending under the agreements and can amount to half a million dollars or more. As such, the penalties well outpace the actual cost of the analyzers, which range in price between $12,000 and $30,000.

102.     IDEXX's long-term exclusive contracts take two primary forms. Since at least 2015, IDEXX has imposed six-year contracts that it euphemistically refers to as "up-front customer loyalty programs" in which the veterinary practices are tied to IDEXX through an "IDEXX Laboratory Diagnostic Agreement" or similar agreement. Under this form of IDEXX agreement, veterinary practices (i) purchase IDEXX POC analyzer(s) up-front, (ii) are forced to purchase an annual minimum purchase amount of qualified IDEXX POC consumables and/or single-use rapid test kits for the duration of the six-year agreement, and (iii) have no right to terminate early without paying the balance of the annual minimum purchase amount remaining on the life of the agreement. The veterinary practices also typically receive some amount of IDEXX Points (each point being worth $1) upfront, which can be used to buy some of the qualified IDEXX products included in the annual minimum purchase amount. However, if the veterinary practice were to attempt to terminate the agreement early, it would have to repay any used IDEXX Points. The IDEXX Points are not free, nor a benefit to the veterinary practice, but instead are a further means of making it financially impossible for the veterinary practice to leave or threaten to leave IDEXX for a cheaper or better POC Diagnostic Product rival.

103.     The analyzers sold to veterinary practices through these long-term exclusionary agreements range in price from around $12,000 (for an IDEXX Catalyst One Chemistry analyzer) to around $30,000 (for an IDEXX Procyte Hematology analyzer). The minimum annual spend amounts IDEXX sets for the veterinary practices under those agreements are not pricing concessions offered on the upfront cost of the analyzer machines. Instead, under IDEXX's exclusive dealing scheme, minimum annual spend requirements are set based on the diagnostic test spending the veterinary practice is expected to run, including spending on analyzer machines using consumables or on single-use rapid test kits, based on each individual business's past practices. In other words, the annual

minimum volume commitments in IDEXX's long-term contracts are typically set at or above a veterinary practice's then current baseline spending for its POC consumables and single-use rapid test kits.

104.    Similarly, in the first quarter of 2018, IDEXX implemented what it describes as a volume commitment program, called IDEXX 360. Through "IDEXX 360 Agreements," IDEXX imposes six-year exclusive agreements on veterinary practices that set minimum purchase amounts covering a variety of qualifying IDEXX products, including IDEXX POC consumables, single-use rapid test kits and Reference Lab Services. These agreements cannot be terminated without paying enormous financial penalties.

105.    To ensure exclusivity, the total minimum spend amounts in both types of IDEXX agreements—the IDEXX Laboratory Diagnostic Agreements and IDEXX 360 Agreements—are set at or above the veterinary practice's expected total purchases of the relevant laboratory services based on past purchasing behavior, thus foreclosing the ability to use competing products and services. If a veterinary practice does not meet its annual minimum purchase amount, or otherwise attempts to exit an IDEXX Laboratory Diagnostic Agreement, IDEXX still forces the veterinary practice to pay the full value of the remainder of the annual minimum purchase amount (*i.e.*, if the agreement had four years remaining, IDEXX forces veterinary practices to pay four times the annual minimum purchase amount to leave).

106.    A veterinary practice covered by an IDEXX 360 Agreement is subject to the same full annual minimum amount penalty as the IDEXX Laboratory Diagnostic Agreement plus additional restrictive requirements. For instance, if a veterinary practice under one of these IDEXX 360 Agreements repeatedly fails to meet its annual minimum spending quotas, IDEXX can collect projected shortfalls on a monthly or quarterly basis without any qualifying IDEXX product being purchased by or provided to the veterinary practice. In other words, if a veterinary practice with, for example, a $40,000 per year purchasing quota repeatedly missed its marks, the contract would allow IDEXX to collect $10,000 each quarter regardless.

107.    These penalty amounts are prohibitively expensive and in line with IDEXX's explanation of the consequences of breaching its long-term exclusive agreements in its 2020 Annual

Report: "If a customer breaches its agreement, they are required to refund all or a portion of the up-front cash or IDEXX Points, or make other repayments, remedial actions, or both."

108.    The key feature of these agreements in locking in veterinary practices and locking out competitors is not the equipment and supplies provided by IDEXX, but the penalties imposed on customers who might want to take their business elsewhere: up to six years' worth or more of the practice's typical spend on POC and other laboratory testing. These exclusivity penalties imposed by IDEXX's long-term agreements effectively prohibit veterinary practices from switching to competitors.

109.    IDEXX strictly polices its long-term exclusive contracts. In January 2021, for instance, IDEXX Laboratories, through its counsel, accused a non-profit animal rescue hospital in Florida of breaching its IDEXX Laboratory Diagnostic Agreement for daring to move its business to Zoetis/Abaxis, and threatened the non-profit hospital with litigation. IDEXX sought over $200,000 due to the hospital's failure to meet annual spend minimums of greater than $76,000, while reminding the hospital that it must purchase 90% of its Reference Lab services from IDEXX as well.

110.    IDEXX does not merely threaten to enforce contractual annual minimum purchase requirements, but in fact has filed multiple lawsuits seeking hundreds of thousands of dollars in penalties from individual veterinary practices that failed to meet IDEXX's quotas. Indeed, in the above example, IDEXX eventually filed suit against the non-profit animal rescue hospital, seeking at least $203,800 in damages. *IDEXX Distribution, Inc. v. Justin Bartlett Animal Rescue, Inc.*, 2:21-cv-0222-JDL (D. Me.).  IDEXX has done the same in myriad other cases. *See, e.g.*, *IDEXX Distribution, Inc. v. Pet Care Veterinary Center, Inc., P.C.*, 2:20-cv-00252 (D. Me.) (asserting that under IDEXX Laboratory Diagnostic Agreement veterinary practice agreed to purchase annually at least $95,055 of qualifying diagnostic products and services from IDEXX and seeking at least at least $282,780); *IDEXX Distribution, Inc. v. Fort Lauderdale Veterinary Center, Inc.*, 2:19-cv-00411 (D. Me.) (asserting that under IDEXX Laboratory Diagnostic Agreement veterinary practice agreed to purchase annually at least $47,398 of qualifying diagnostic products and services from IDEXX and seeking at least $190,795); *IDEXX v. Auburn, Inc.*, 2:17-cv-00098 (D. Me.) (seeking at least $117,000 by enforcing contractual provision that veterinary practice would purchase an "Annual Minimum

Purchase Amount" of qualifying POC Diagnostic Products from IDEXX); *IDEXX Laboratories, Inc., et al. v. Donkate Enterprises, Inc. d/b/a Veterinary Center at Fishawk*, No. 17-cv-100 (D. Me) (asserting that under IDEXX Laboratory Diagnostic Agreement veterinary practice agreed to purchase annually at least $57,000 of qualifying reference laboratory services and certain in-house diagnostic products from IDEXX and seeking at least $247,000).

111.   One veterinary practice that IDEXX sued characterized its experience as a "nightmare" and stated that IDEXX threatened that it would not allow the practice to terminate the contract unless the practice paid it nearly $300,000:

> "As of today's date, in the event you stop performing your obligations under the Agreement . . . IDEXX would be willing to mutually terminate the Agreement with no further liability on the part of either party for $289,750. This is comprised of the remaining amount required to meet your Annual Minimum Purchase Amounts over the next sixty-one months, when the Agreement would otherwise expire."

*IDEXX Laboratories, Inc., et al. v. Donkate Enterprises, Inc. d/b/a Veterinary Center at Fishawk*, No. 17-cv-100, ECF No. 9 at 13, 20 (April 17, 2017 D. Me.).

112.   For those veterinary practices that are unable to meet their minimum spend requirements, the threats from IDEXX to bankrupt the practices and fear of lawsuits seeking hundreds of thousands of dollars successfully secure exclusivity for IDEXX. IDEXX uses its threats and lawsuits as leverage to extend its exclusive agreements with still more minimum spend requirements, thereby preventing the distressed practices from ever being able to buy from rivals. The perpetual nature of IDEXX's contracts further explains why IDEXX has been able to retain customers at an unheard-of rate of 96% or more even after the FTC Order.

113.   IDEXX also targets new veterinary practices with offers of zero purchase requirements in the first year of practice, but then adds steadily increasing minimum purchase amounts thereafter to trap the new practices in IDEXX's perpetual exclusive contract web.

114.   When veterinary practices can't keep up with the financial commitments, IDEXX "renegotiates" by extending the agreements even longer and preventing competitors in the Relevant Market and Submarkets from ever having a chance to compete. IDEXX's contracts prevent practices

from ever having the flexibility to switch business to a POC Diagnostic Product competitor due to the excessive penalties tied to violating IDEXX's exclusivity requirements.

115.   There is simply no way for veterinary practices to terminate their agreements with IDEXX early without incurring severe penalties—often requiring the payment of multiple years' worth of anticipated POC laboratory spending. Likewise, there is no economically viable way for a competitor to price POC Diagnostic Products low enough to justify the veterinary practice taking on the huge penalty from IDEXX, even if it could theoretically afford to do so, or to pay the penalty itself to allow the veterinary practice to switch its business. IDEXX's scheme simply raises the costs for veterinary practices to switch and competitors to compete to such a level that competition becomes impossible.

116.   To further insulate itself from competition, unlike other PIMS providers, IDEXX has programmed its Cornerstone PIMS software to prevent integration of information from rival POC analyzers and Reference Lab Services. This means veterinary practices using Cornerstone—about 28% of veterinary practices in the United States—cannot easily or efficiently integrate and incorporate results from non-IDEXX POC or Reference Lab Service providers. Consequently, IDEXX Cornerstone users are unlikely to use competing POC analyzers or Reference Lab Service providers, and if an IDEXX user were to switch from IDEXX to a competing POC or Reference Laboratory Service provider it would have to obtain or contract with a competing PIMS software provider and restructure its back-office operations. IDEXX's programming of Cornerstone to preclude competitors further cements IDEXX's stranglehold over veterinary practices, as those that wish to leave IDEXX face yet another expensive impediment to doing so.

117.   To the extent that Reference Lab Services might have been used as a means to infiltrate IDEXX's control over veterinary practices, IDEXX has worked to cut off that option by (a) including References Lab Services among the qualified products that count to the annual minimum spend and/or (b) imposing contractual requirements that veterinary practices purchase 90% of their Reference Lab Services from IDEXX. Thus, any diversion of Reference Lab Services spending to competitors would result in a penalty—the difference between the contractual minimum and the veterinary practice's actual spend—that would make the competitive services prohibitively expensive.

118.    IDEXX also has worked to insulate itself from Reference Lab Services competition through acquisitions of competing reference labs. For example, IDEXX recently acquired Marshfield Labs, despite already running a competing reference laboratory in the Marshfield region, and then laid off the Marshfield Labs employees and closed the acquired facilities. Evidently, the primary goal of IDEXX's acquisition was to obtain Marshfield Labs' customer base and lock those customers into multi-year contracts that both block competition and increase customer prices.

**D.    IDEXX's Conduct Substantially Foreclosed Competition**

119.    IDEXX's conduct as alleged herein has substantially foreclosed competition in the Relevant Market and Submarkets and has enabled IDEXX to impose supracompetitive prices for POC Diagnostic Products.

120.    IDEXX's anticompetitive scheme has erected significant barriers to entry and expansion for those companies, such as Zoetis and Heska, that have offered or otherwise would offer for sale POC Diagnostic Products to compete with IDEXX.

121.    IDEXX's long-term exclusive contracts allow it to maintain and even grow its dominant share of the Relevant Market and Submarkets and thereby to charge supracompetitive prices. As explained above, a veterinary practice that has contracted with IDEXX under one of its long-term contracts is subject to minimum spend provisions that require the practice to use IDEXX for its POC Diagnostic Product needs with no way out absent paying IDEXX the minimum spend total, encompassing consumables, single-use rapid test kits and/or Reference Lab Services for the remainder of the six-year contract.

122.   The penalties imposed by IDEXX under its contracts—which IDEXX aggressively enforces through threats and lawsuits—prevent competition, as any would-be competitor would need to compensate veterinary practices for those penalties. Given that those penalties account for years' worth of POC laboratory test spending, the cost of switching an individual veterinary practice from IDEXX that a customer or competitor would have to bear is prohibitively expensive. And even if such an arrangement were possible on a small subset of veterinary practices at any given time, IDEXX's use of automatic renewal provisions and pattern of extending its exclusive agreements well

in advance of expiration preclude rivals from having access to a critical mass of veterinary practices that it could switch without paying the excessive penalties.

123.   IDEXX's contracts last six years, and thus, in theory, in any given year about 16.5% of its veterinary customers should be available for conversion to a competitor. But because of IDEXX's tactics, including extending contracts before they get to the end, nowhere near that many practices convert, and even those practices that do have expiring contracts are so in debt to IDEXX that the contracts are essentially uncontestable because they will inevitably succumb to renewal with IDEXX to be able to extend their debt over additional years. So only a handful of practices are actually available to the competition in any given year. And, of those, many are locked in because they use IDEXX's PIMS system. As a result, IDEXX's rivals have no real ability to cut into IDEXX's dominant shares of the Relevant Market and Submarkets. Accordingly, because of IDEXX's tactics, rivals do not have the ability or incentive to invest further in competing in the Relevant Market or Submarkets because, no matter the investment, they cannot achieve sufficient scale for such investments to be profitable.

124.   The effectiveness of IDEXX's scheme is reflected in its own public statements. As part of an August 14, 2019 investor day presentation, IDEXX explained that since 2013—the year of the FTC Order—its retention of POC consumables customers has never dipped below 96% and since 2015 has steadily grown so that IDEXX anticipated retaining an astounding 98.7% of its POC consumable customers in 2019.

Class Action Complaint



125.   Indeed, IDEXX has touted that its business is: "supported by our extraordinary customer loyalty and retention rates, which range from 96% to 99.9%, depending on the product line and geography. We estimate that our recurring revenue has grown from 81% of our total revenue in 2010 to 89% in 2019, and the largest contributor is our [Companion Animal Group] Diagnostics business, which constituted 76% of our total 2019 revenue."

126.   Similarly, IDEXX has shown that as of 2018, 75% of IDEXX's revenues were generated from the recurring POC consumables sold under IDEXX's long-term exclusionary contracts and that it expects the good times to roll on with 80% of its billions in revenues coming from veterinary practices locked into long-term exclusionary contracts by 2024.

127.   It is no surprise that IDEXX has not faced any real competitive threat, as its conduct described above has substantially foreclosed veterinary practices comprising sales of at least 70% of the Relevant Market and Submarkets from competition from Zoetis, Heska, or any other would-be competitor.

128.   Indeed, even Zoetis, which as a former Pfizer, Inc. subsidiary and global leader in animal health medicines and vaccines had a natural entry point to the Relevant Market and

Submarkets, has not been able to break IDEXX's stranglehold. Zoetis's lack of success—and the effectiveness of IDEXX's scheme—is particularly striking when one considers that that Zoetis spent approximately $2 billion acquiring Abaxis in 2018 to bolster its efforts in the Relevant Market and Submarkets, but that acquisition has done almost nothing to reduce IDEXX's monopoly power.

129.    Abaxis, though having only a small share of the Relevant Market and Submarkets, offered a full array of POC analyzers, related consumables, and single-use rapid test kits at the time of Zoetis's acquisition. As explained by Zoetis's CEO, "Abaxis, with its VetScan family of diagnostic instruments, brings Zoetis experienced colleagues and a proven, competitive platform for growth in diagnostics." The CEO further explained Zoetis's goal to "leverage[e] [its] global scale and direct customer relationships in approximately 45 countries, [to] help Abaxis accelerate that growth in the U.S. and worldwide. Together, we can bring more veterinarian customers comprehensive solutions to predict, prevent, detect, and treat disease in animals."

130.    But even after the Abaxis acquisition, Zoetis has not been able to take market share from IDEXX, despite the combined resources of Zoetis and Abaxis, and despite Zoetis offering contracts that are much friendlier to veterinary practices, as they can be terminated on limited notice at the practice's discretion without incurring oppressive penalties.

131.    Indeed, Zoetis offers two options to veterinary practices. The first is a Freedom Flex plan under which a veterinary practice is provided POC analyzers that they can use at no charge if the practice maintains a minimum spend on POC consumables and single-use rapid test kits with Zoetis. However, unlike IDEXX, Zoetis does not lock the veterinary practice in for the duration of the agreement. Instead, if the practice cannot fulfill the spending levels with Zoetis or is dissatisfied with the equipment, it can return the equipment without penalty.

132.    Zoetis also offers a Freedom plan through which a veterinary practice purchases POC equipment (such as a VetScan VS2 Blood Chemistry analyzer for $11,600 or a VetScan HM5 Hematology analyzer for $12,900) and earns rebates from Zoetis on consumables and single-use rapid test kit purchases that can be used towards the cost of the machines. These arrangements are typically financed through a 72-month lease with a third-party financing company and cost less than $1,000 per month.

133.   If a veterinary practice switches from Zoetis to a different POC Diagnostic Product provider, it can pay the equipment balance from the leasing company under the Freedom plan. The veterinary practice incurs no additional penalty or requirement to purchase future consumables or single-use rapid test kits or pay back previously earned rebates under the contract with Zoetis.

134.   Yet Zoetis, a large global leader in the veterinary space with more favorable contract terms and products of comparable qualities to those offered by IDEXX, cannot break through IDEXX's web of long-term exclusive agreements because of the excessive switching costs imbedded in IDEXX's agreements, as any attempt to convert IDEXX customers would force Zoetis to take on the veterinary practice's draconian IDEXX penalties (*i.e.*, the remainder of the annual minimum spend amounts). Doing so would force Zoetis to price its POC Diagnostic Products below cost, which is impossible at a large enough scale to allow Zoetis to compete with IDEXX and act as a restraint on IDEXX's prices. Zoetis is further locked out by IDEXX's use of automatic renewal provisions and its practice of extending agreements before expiration to lock veterinary practices into IDEXX in perpetuity, thus depriving Zoetis of any real opportunity to compete for business from a substantial number of practices. The same economic realities apply to Heska or any other would-be competitor in the Relevant Market and Submarkets.

135.   IDEXX's exclusive agreements have the additional purpose and effect of anticompetitively impeding rivals' ability to compete in the Rapid Test Kit market by including IDEXX's single-use rapid test kits among the IDEXX products that are covered by a veterinary practice's minimum spend quotas. By bundling its single-use rapid test kits with its analyzer/consumables, IDEXX ensures that any veterinary practice tied to IDEXX's analyzers through the exclusive agreements would risk triggering the oppressive penalties of years' worth of laboratory spending if it were to buy single-use rapid test kits from IDEXX's rivals.

136.   As a result of IDEXX's anticompetitive scheme, the aggregate penalty that a veterinary practice pays for missing its minimum spend quota is so large that if that practice subtracts that penalty from the prices paid to Zoetis or Heska for analyzers/consumables, single-use rapid test kits, or both, the price would be below the cost of selling those products. Accordingly, a hypothetical equally efficient rival selling POC Diagnostic Products would have to sell below its costs in order to compete

on an equal basis with IDEXX. This is because the hypothetical equally efficient competitor to IDEXX would need to compensate the veterinary practice for all the penalties that the buyer would incur for breaking IDEXX's bundle and incurring IDEXX's other switching penalties.

137.    Thus, it is unsurprising that since 2018 when Zoetis acquired Abaxis, veterinary practices overwhelmingly turn Zoetis away because veterinary practices simply cannot afford the penalties associated with leaving IDEXX, no matter how good the offer is from Zoetis (or Heska). IDEXX's exclusive agreements simply provide veterinary practices with no flexibility to do business with IDEXX's competitors. Absent IDEXX's conduct, more veterinary practices could and would switch to IDEXX's competitors, or IDEXX would substantially lower its prices, or both.

138.    IDEXX's conduct has substantially foreclosed rivals from competing for POC Diagnostic Products business, including the business for the sale of POC analyzer/consumables and single-use rapid test kits to veterinary practices and thereby limited competition in the Relevant Market and Submarkets, leading to supracompetitive prices, lower output, reduced innovation and diminished consumer choice.

**E.    Anticompetitive Effects of IDEXX's Conduct**

139.    IDEXX's anticompetitive and exclusionary conduct as alleged herein has the purpose, capacity, tendency, and effect of impairing the competitive effectiveness of IDEXX's competitors in the Relevant Market and Submarkets.

140.    IDEXX's anticompetitive and exclusionary conduct alleged herein has resulted in IDEXX's willfully acquiring and/or maintaining monopoly power in the Relevant Market and Submarkets.

141.    IDEXX intended to harm and did harm competition in the Relevant Market and Submarkets by:

a.    reducing the output of POC Diagnostic Products;

b.    locking in customers to long-term contracts that ultimately increase the prices that veterinary practices pay for POC Diagnostic Products;

c.    deterring, delaying, foreclosing, and impeding the ability of IDEXX's actual or potential competitors to enter or to expand their sales in the market for POC Diagnostic Products;

d.      reducing innovation;

e.      reducing consumer choice among users of POC Diagnostic Products; and

f.      causing indirect purchasers of IDEXX POC Diagnostic Products to pay artificially inflated prices.

142.    IDEXX's anticompetitive conduct through its long-term non-terminable exclusive contracts has impaired competition in the sale of POC Diagnostic Products, including analyzers, consumables and single-use rapid test kits in the United States and has unlawfully enabled IDEXX to sell its products at artificially inflated prices. But for IDEXX's unlawful conduct, competitors like Zoetis and Heska would have been able to compete, unimpeded, with their products. Such competition would have led to lower prices for analyzers, consumables and single-use rapid test kits. And had competition caused IDEXX to sell its analyzers, consumables, and single-use rapid test kits at lower prices, Plaintiffs and other members of the Class would have paid less for those products. There is no valid procompetitive justification for IDEXX's long-term exclusionary contracts that cannot be terminated without the veterinary practice incurring an obscenely large and unaffordable penalty that is equivalent to years' worth of laboratory spending.

143.    IDEXX did not use these long-term non-terminable exclusionary contracts to achieve economies of scale or other efficiencies.

144.    IDEXX's unlawful conduct deprived Plaintiffs and the Class of the benefits of competition that the antitrust laws were designed to ensure.

**F.      <u>Injury and Damages to Plaintiff and the Class</u>**

145.    IDEXX uses the monopoly power it maintained through the challenged conduct to raise prices of its POC Diagnostic Products well above competitive levels. Even when Zoetis threatened to shake up the industry with its acquisition of Abaxis, IDEXX did not flinch, still expecting to raise net prices by two to three percent in the face of what should have been increased competition.

146.    IDEXX itself identifies the effect of its scheme on prices paid by veterinary practices, explaining that it has been able to "[m]aintain[] premium pricing, including by effectively implementing price increases, for our differentiated products and services … in an environment where many of our competitors promote, market, and sell lesser offerings at prices lower than ours…."

147. IDEXX explains in its 2021 Annual Report that its revenue and margins are substantially derived "from the sale of consumables that are used in IDEXX VetLab instruments and the multi-year consumable revenue stream is significantly more valuable than the placement of the instrument." This scheme is highly profitable—indeed, IDEXX's "consumables and rapid assay test kits, have significantly higher gross margins than those provided by [IDEXX's] instrument sales"— and these locked-in sales account for nearly 90% of IDEXX's total company sales, further evidencing that IDEXX has foreclosed competition from rivals for the business of a vast majority of IDEXX customers, which is over 70% of each of the Relevant Market and Submarkets.

148. As explained, IDEXX no longer sells its POC Diagnostic Products through distributors and instead sells its products only directly to veterinary practices. During the Class Period defined below, veterinary practices then sold POC Diagnostic Products to Class members in the same form in which they purchased them from IDEXX, meaning IDEXX POC Diagnostic Products followed a traceable physical chain from Defendants to Plaintiffs and Class members, and the overcharges on them can be traced from Defendants to Plaintiffs and Class members.

149. While direct purchaser veterinary practices were the first to pay supracompetitive prices for IDEXX POC Diagnostic Products, all or most of the overcharge was passed along the distribution chain and absorbed by Plaintiffs and Class members when they indirectly purchased those products. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution to indirect purchasers. Thus, the economic harm to Plaintiffs and the Class members can be quantified.

150. As a consequence of IDEXX's anticompetitive conduct as alleged herein, during the Class Period defined below, Plaintiffs and other members of the Class indirectly purchased POC Diagnostic Products at artificially inflated prices, which were substantially higher than they would have paid absent IDEXX's unlawful conduct. Plaintiffs and members of the Class have sustained losses and damages to their business and property in the form of paying artificially inflated prices ("overcharges"), which are the type of injuries that the antitrust laws were designed to prevent and are a direct and proximate result of IDEXX's unlawful conduct. Therefore, Defendants have caused antitrust injury to Plaintiffs and all members of the Class.

# VI. CLASS ALLEGATIONS

151.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure as representatives of a class (the "Class") defined as follows:

> All persons and entities in Repealer Jurisdictions who indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of IDEXX POC analyzers, consumables, or single-use rapid test kits for companion animals, other than for resale, at any time during the period from July 26, 2018 through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

152.    A Repealer Jurisdiction is a state or district that has repealed the bar on indirect purchaser plaintiffs recovering under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and includes the following: Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

153.    The following are specifically excluded from the Class: the Defendants; the officers, directors, and employees of the Defendants; any entity in which the Defendants have a controlling interest; any divisions, subsidiaries, and predecessors of the Defendants; and any affiliate, legal representative, heir, or assign of the Defendants. Also excluded from the Class are: any federal, state, or local governmental entity; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified during the course of this action.

154.    At least hundreds of thousands of persons or entities have indirectly purchased IDEXX POC Diagnostic Products during the Class Period. Thus, the Class is so numerous that joinder is impracticable.

155.    Plaintiffs' claims are typical of the Class.

156.    Plaintiffs and all members of the Class were injured in the form of overcharges caused by Defendants' same conduct.

157.   Plaintiffs will fairly and adequately protect and represent the interests of the Class. Plaintiffs' interests are not antagonistic to those of the Class.

158.   Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

159.   Questions of law and fact are common to the members of the Class and predominate over questions, if any, that may affect only individual members because IDEXX has acted and refused to act on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in IDEXX's exclusionary and anticompetitive conduct in monopolizing the Relevant Market and Submarkets, as more fully alleged herein.

160.   Questions of law and fact common to the class include:

a.   Whether IDEXX intentionally or unlawfully impaired or impeded competition in the POC Diagnostic Products market, Analyzer & Consumables submarket and Rapid Test Kit submarket;

b.   Whether IDEXX willfully maintained or enhanced monopoly power in the POC Diagnostic Products market, Analyzer & Consumables submarket and Rapid Test Kit submarket;

c.   Whether IDEXX has monopoly power in the POC Diagnostic Products market, Analyzer & Consumables submarket and Rapid Test Kit submarket;

d.   The effects of IDEXX's conduct on prices for POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits;

e.   Whether IDEXX's scheme, in whole or in part, caused antitrust injury to the business or property of Plaintiffs and the members of the Class in the nature of overcharges; and

f.   The proper measure of damages.

161.   The Class is readily identifiable from information and records in the possession of Defendants.

162.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that might arise in management of this class action.

163.    Plaintiffs know of no difficulty to be encountered in maintenance of this action as a class action.

**VII.  CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**15 U.S.C. § 1**
**(ON BEHALF OF RESIDENTS IN REPEALER JURISDICTIONS FOR DECLARATORY AND EQUITABLE RELIEF)**

164.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

165.    At all relevant times IDEXX Distribution acted as an alter-ego for IDEXX Laboratories or IDEXX Laboratories and IDEXX Distribution acted as a single enterprise.

166.    The relevant market is the POC Diagnostic Products market and the relevant geographic market is the United States. IDEXX has had and continues to have at least a 70% market share in the POC Diagnostic Products market in the United States. At all relevant times IDEXX has had monopoly power in the POC Diagnostic Products market.

167.    A narrower relevant product submarket within the POC Diagnostic Products market is the Analyzer & Consumables submarket and the relevant geographic market is the United States. At all relevant times IDEXX has had monopoly power in the Analyzer & Consumables submarket.

168.    A second narrower relevant product submarket within the POC Diagnostic Products Market is the Rapid Test Kit submarket and the relevant geographic market is the United States. At all relevant times IDEXX has had monopoly power in the Rapid Test Kit submarket.

169.    IDEXX has had and continues to have the power to control prices and/or exclude competition in the POC Diagnostic Products market in the United States, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket.

170.    IDEXX entered into agreements with veterinary practices that contained anticompetitive terms that were designed to hobble IDEXX's competitors and to keep prices for POC Diagnostic Products artificially high.

171.    The agreements between IDEXX and veterinary practices had substantial anticompetitive effects. The agreements effectively excluded Zoetis, Heska, and every other actual or potential rival provider of POC Diagnostic Products from competing for a substantial portion of transactions in the Relevant Market and Submarkets.

172.    The agreements between IDEXX and veterinary practices raised prices for POC Diagnostic Products above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to customers.

173.    IDEXX's exclusionary and anticompetitive acts have injured and will continue to injure competition in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket.

174.    IDEXX's exclusionary and anticompetitive acts affect interstate commerce and injure competition nationwide.

175.    IDEXX's conduct has caused Plaintiffs and those similarly situated to suffer damages in the form of injuries to their business or property, and Plaintiffs and all others similarly situated will continue to suffer such damages if IDEXX does not cease its anticompetitive conduct.

176.    Plaintiffs and all others similarly situated have been injured in their business or property by reason of IDEXX's violation of Sections 1 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C § 15.

177.    Plaintiffs and all others similarly situated are threatened with future injury to their business and property by reason of IDEXX's continuing violation of Section 1 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

178.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a), Plaintiffs and the Class seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described in the preceding paragraphs violates Section 1 of the Sherman Act.

179.    Plaintiffs and members of the Class seek and are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT**
**15 U.S.C. § 2**
**(ON BEHALF OF RESIDENTS IN REPEALER JURISDICTIONS FOR DECLARATORY AND EQUITABLE RELIEF)**

180.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

181.    IDEXX has willfully and intentionally maintained, enhanced, and abused its monopoly power in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, through long-term anticompetitive exclusive agreements with veterinary practices that could not be terminated by Plaintiffs or members of the Class without incurring a cost-prohibitive penalty. For example, by including single-use rapid tests kits among the bundle of products covered by the quotas in its exclusive agreements, IDEXX prevents rivals from being able compete for single-use rapid test kit business based on price because such rivals would have to also cover the severe penalties—typically in excess of $100,000 and often upward of half a million dollars—imposed by IDEXX under its exclusive agreements, thereby preventing an efficient rival, like Zoetis, from competing in the Rapid Test Kit submarket. The purpose of IDEXX's conduct is to impede competition and provide IDEXX with an unlawful competitive advantage rather than competing on the merits through lower prices or higher quality products.

182.    By suppressing competition and maintaining and enhancing its monopoly power, IDEXX was and is able to artificially inflate prices of its POC Diagnostic Products above levels that it would have obtained in a world in which IDEXX did not engage in the anticompetitive conduct alleged herein.

183.    There are no procompetitive justifications for IDEXX's conduct, and even if there were, there are less restrictive means to achieve them.

184.    IDEXX's exclusionary conduct has foreclosed a substantial share of the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test

Kit submarket, as IDEXX, with an over 70% share of the POC Diagnostic Products market, imposes its unlawful exclusivity agreements on a vast majority of its veterinary practice customers.

185.   Through the anticompetitive and exclusionary practices described above, IDEXX has willfully and unlawfully maintained and enhanced its monopoly power in the POC Diagnostic Products market in violation of Section 2 of the Sherman Act.

186.   IDEXX's exclusionary and anticompetitive acts have injured and will continue to injure competition in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket.

187.   IDEXX's exclusionary and anticompetitive acts affect interstate commerce and injure competition nationwide.

188.   As a direct and proximate result of IDEXX's violation of Section 2 of the Sherman Act, Plaintiffs and Class members have been injured in their businesses and property in the form of overcharges, and Plaintiffs and all other Class members will continue to suffer such injuries if IDEXX does not cease its anticompetitive conduct. These injuries are of the type the antitrust laws were designed to prevent and flow from that which makes IDEXX's conduct unlawful.

189.   As a direct and proximate result of IDEXX's violation of Section 2 of the Sherman Act, Plaintiffs and Class members have suffered injury and damages in the form of paying artificially inflated prices for POC Diagnostic Products purchased indirectly during the Class Period.

190.   Plaintiffs and Class members have been injured in their business or property by reason of IDEXX's violations of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

191.   Plaintiffs and Class members are threatened with future injury to their business and property by reason of IDEXX's continuing violation Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

192.   Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a), Plaintiffs and the Class seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described in the preceding paragraphs violates Section 2 of the Sherman Act.

193.    IDEXX engaged in the anticompetitive conduct alleged herein after it was subject to an FTC order aimed at ending its other anticompetitive conduct, which demonstrates that the anticompetitive conduct alleged herein is highly susceptible to reoccurrence. IDEXX should be enjoined from willfully and intentionally maintaining, enhancing, and abusing its monopoly power in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, through long-term anticompetitive exclusive agreements with veterinary practices that could not be terminated by those practices without triggering cost-prohibitive penalties. Plaintiffs, on behalf of themselves and other Class members, seek injunctive relief against IDEXX for its violation of Section 2 of the Sherman Act, preventing and restraining the violations alleged herein.

## VIOLATIONS OF STATE ANTITRUST LAWS

194.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

195.    The following Third through Twenty-Eighth Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the Class.

196.    Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same. The above-alleged conduct, which violates the federal Sherman Antitrust Act, will, if proven, establish a claim under each of the state laws cited below.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,
### ARIZ. REV. STAT. § 44-1401, ET SEQ.

197.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

198.    By reason of the conduct alleged herein, Defendant has violated ARIZONA REV. STAT. § 44-1401, *et seq.*

199.    Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

46

200.    Under Arizona law, "[t]he establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by any person for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful." ARIZ. REV. STAT. § 44-1403.

201.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Arizona.

202.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the POC Diagnostic Products market.

203.    Defendants' violations of Arizona law were flagrant.

204.    Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

205.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

206.    By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available under Arizona Revised Statutes Section 44-1401, *et seq*.

207.    In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Arizona Attorney General in accordance with ARIZ. REV. STAT. ANN. § 44-1415. Plaintiffs will file proof of such service with the Court.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,**
**CAL. BUS. & PROF. CODE § 16700, *ET SEQ.***

208.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

209. The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700-16770, governs antitrust violations in California.

210. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. CAL. BUS. & PROF. CODE § 301.

211. Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. CAL. BUS. & PROF. CODE § 16750(a).

212. A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. CAL. BUS. & PROF. CODE § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

213. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products Market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within California.

214. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products Market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the POC Diagnostic Products Market.

215. Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of CAL. BUS. & PROF. CODE § 16700, *et seq.*

216. Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products within the State of California during the Class Period. But for Defendant's conduct set forth herein,

the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

217.    Plaintiffs and members of the Class were injured in their business or property, with respect to purchases of IDEXX POC Diagnostic Products in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF DISTRICT OF COLUMBIA ANTITRUST ACT,**
**D.C. CODE § 28-4501, *ET SEQ.***

218.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

219.    The policy of the District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices." D.C. CODE § 28-4501.

220.    Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products within the District of Columbia during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

221.    Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this complaint, because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. CODE § 28-4509(a).

222.    IDEXX contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the market for POC Diagnostic Products, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, within the District of Columbia, in violation of D.C. CODE § 28-4501, *et seq*.

223.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF ILLINOIS ANTITRUST ACT**
**740 ILL. COMP. STAT. ANN. 10/3(1),** *et seq.*

224.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

225.    The Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 ILL. COMP. STAT. ANN. 10/2.

226.    Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

227.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this complaint. 740 ILL. COMP. STAT. ANN.10/7(2).

228.    Defendants entered into contracts or engaged in a combination or conspiracy for the purpose of fixing, controlling or maintaining prices for POC Diagnostic Products sold within the State of Illinois.

229.    Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the POC Diagnostic Products market in Illinois, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, for the purpose of excluding competition, in violation of 740 ILL. COMP. STAT. ANN. 10/1, *et seq*.

230.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

1
2

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF IOWA COMPETITION LAW**
**IOWA CODE § 553.1, *et seq.***

3
4

231.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

5
6

232.     The Iowa Competition Law aims to "prohibit[] restraints of economic activity and monopolistic practices." IOWA CODE § 553.2.

7
8
9

233.     Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-51 (Iowa 2002).

10
11
12

234.     Members of the Class purchased IDEXX POC Diagnostic Products within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

13
14
15
16
17

235.     Defendants contracted, combined or conspired to restrain or monopolize trade in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing, or maintaining prices for POC Diagnostic Products, in violation of Iowa Code § 553.1, *et seq*.

18
19
20

236.     Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

21
22
23

**EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF KANSAS RESTRAINT OF TRADE ACT**
**KAN. STAT. ANN. § 50-101, *ET SEQ.***

24
25

237.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

26
27
28

238.     The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." KAN. STAT. ANN. § 50-112.

239.     Members of the Class purchased IDEXX POC Diagnostic Products within the State of Kansas during the Class Period.

240.     But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

241.     Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. KAN. STAT. ANN. § 50-161(b).

242.     Defendants combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of POC Diagnostic Products, increasing the price of POC Diagnostic Products, or preventing competition in the sale of POC Diagnostic Products, in a manner that established the price of POC Diagnostic Products and precluded free and unrestricted competition among themselves in the sale of POC Diagnostic Products, in violation of KAN. STAT. ANN. § 50-101, *et seq.*

243.     Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

### NINTH CLAIM FOR RELIEF
### VIOLATION OF MAINE'S ANTITRUST STATUTE
### ME. REV. STAT. ANN. TIT. 10 § 1101, *et seq.*

244.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

245.     Part 3 of Title 10 of the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. *See* ME. REV. STAT. ANN. tit. 10, §§ 1101-02.

246.     Members of the Class purchased IDEXX POC Diagnostic Products within the State of Maine during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

247.     Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. ME. REV. STAT. ANN. tit. 10, § 1104(1).

248.    Defendants contracted, combined or conspired in restraint of trade or commerce of POC Diagnostic Products within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of POC Diagnostic Products within the intrastate commerce of Maine, in violation of ME. REV. STAT. ANN. tit. 10, § 1101, *et seq.*

249.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**TENTH CLAIM FOR RELIEF**
**VIOLATION OF MARYLAND'S ANTITRUST STATUTE**
**MD. CODE ANN. § 11-204(A), *et seq.***

250.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

251.    Maryland's antitrust statute makes it unlawful to, *inter alia*, "[m]onopolize, attempt to monopolize, or combine or conspire with one or more other persons to monopolize any part of the trade or commerce within the State, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce." MD. CODE ANN. § 11-204(a)(2).

252.    The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." MD. CODE ANN. § 11-202(a)(1).

253.    Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MD. CODE. ANN. § 11-209(b)(2)(i).

254.    Defendants contracted, combined or conspired in restraint of trade or commerce of POC Diagnostic Products within the intrastate commerce of Maryland, and monopolized or attempted to monopolize the trade or commerce of POC Diagnostic Products within the intrastate commerce of Maryland, in violation of MD. CODE ANN. § 204(a)(2), *et seq.*

255.    Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonably attorneys' fees. MD. CODE ANN. § 209(b)(4).

256.     Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**ELEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT**
**MICH. COMP. LAWS § 445.771, *ET SEQ.***

257.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258.     The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984 (MICH. COMP. LAWS § 445.771, *et seq.*).

259.     Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

260.     Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. MICH. COMP. LAWS § 445.778(2).

261.     Defendants contracted, combined, or conspired to restrain or monopolize trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, and established, maintained, or used, or attempted to establish, maintain, or use, a monopoly of trade or commerce in violation of MICH. COMP. LAWS §445.773.

262.     Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**TWELFTH CLAIM FOR RELIEF**
**VIOLATION OF THE MINNESOTA ANTITRUST LAW**
**MINN. STAT. §§ 325D.49, *et seq.* & 325D.57, *et seq.***

263.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

264.    The Minnesota Antitrust Law of 1971 prohibits "any contract, combination or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of the forgoing affects the trade or commerce of [Minnesota]." MINN. STAT. § 325D.54.

265.    Members of the Class purchased IDEXX POC Diagnostic Products within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

266.    Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MINN. STAT. § 325D.57.

267.    Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the POC Diagnostic Products Market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, within the intrastate commerce of and outside of Minnesota, and established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for POC Diagnostic Products, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, for the purpose of affecting competition or controlling, fixing, or maintaining prices within the intrastate commerce of and outside of Minnesota, in violation of MINN. STAT. § 325D.49, *et seq.*

268.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

269.     In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Minnesota Attorney General in accordance with MINN. STAT. § 325D.63.

**THIRTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE**
**MISS. CODE ANN. § 75-21-1, *et seq.***

270.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

271.     Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. MISS. CODE ANN. § 75-21-39.

272.     "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. MISS. CODE ANN. § 75-21-1.

273.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Mississippi.

274.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Mississippi, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the POC Diagnostic Products Market.

275.     Defendants sold POC Diagnostic Products to veterinary practices within Mississippi.

276.     Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products within the State of Mississippi during the Class Period. But for Defendants' conduct set forth herein,

the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

277.    Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. MISS. CODE ANN. § 75-21-9.

278.    Defendants combined, contracted, understood, and agreed in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of POC Diagnostic Products and hindering competition in the sale of POC Diagnostic Products, in violation of MISS. CODE ANN. § 75-21-1, *et seq*.

279.    Defendants monopolized or attempted to monopolize the production, control or sale of POC Diagnostic Products, in violation of MISS. CODE ANN. § 75-21-3, *et seq*.

280.    POC Diagnostic Products are sold indirectly via distributors throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

281.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

### FOURTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
### MO. ANN. STAT. § 407.010, *et seq.*

282.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

283.    Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

284.    Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products within the State of Missouri during the Class Period. But for Defendants' conduct set forth herein, the

price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

285.    Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

286.    Defendants contracted, combined or conspired in restraint of trade or commerce of POC Diagnostic Products within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the market for POC Diagnostic Products, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of MO. STAT. § 407.010, *et seq*.

287.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**FIFTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEBRASKA JUNKIN ACT**
**NEB. REV. STAT. § 59-801, *et seq*.**

288.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

289.    Chapter 59 of the Nebraska Revised Statutes generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

290.    Members of the Class purchased IDEXX POC Diagnostic Products within the State of Nebraska during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

291.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. NEB. REV. STAT. § 59-821.

292.    Defendants contracted, combined or conspired in restraint of trade or commerce of POC Diagnostic Products within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for POC Diagnostic Products, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets, and otherwise control trade, in violation of NEB. REV. STAT. § 59-801, *et seq*.

293.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**SIXTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT**
**NEV. REV. STAT. § 598A.010, *et seq*.**

294.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

295.    The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1).

296.    The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." NEV. REV. STAT. ANN. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. § 598A.060.

297.    Members of the Class purchased IDEXX POC Diagnostic Products within the State of Nevada during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

298.     Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. NEV. REV. STAT. ANN. § 598A.210(2).

299.     Defendants monopolized or attempted to monopolize trade or commerce of POC Diagnostic Products within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of NEV. REV. STAT. ANN. § 598A.010, *et seq*.

300.     Plaintiffs and members of the Class were injured with respect to purchases of POC Diagnostic Products in Nevada in that at least thousands of sales of IDEXX POC Diagnostic Products took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendants' conduct.

301.     Accordingly, Plaintiffs and members of the Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

302.     In accordance with the requirements of § 598A.210(3), Plaintiffs mailed notice of this action to the Nevada Attorney General.

**SEVENTEENTH CLAIM FOR RELIEF**
**VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,**
**N.H. REV. STAT. ANN. tit. XXXI, § 356, *et seq*.**

303.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

304.     Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

305.     Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. REV. STAT. ANN. tit. XXXI, §§ 356:2, 3.

306.     Members of the Class purchased IDEXX POC Diagnostic Products within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

307.     Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. REV. STAT. ANN. § 356:11(II).

308.    Defendants established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of in violation of N.H. REV. STAT. ANN. § 356:1, *et seq.*

309.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**EIGHTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW MEXICO ANTITRUST ACT,**
**N.M. STAT. ANN. § 57-1-1, *et seq.***

310.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

311.    The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. STAT. ANN. § 57-1-15.

312.    Members of the Class purchased IDEXX POC Diagnostic Products within the State of New Mexico during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

313.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.M. STAT. ANN. § 57-1-3(A).

314.    Defendants contracted, agreed, combined or conspired in restraint of, and monopolized or attempted to monopolize, trade for POC Diagnostic Products within the intrastate commerce of New Mexico, in violation of N.M STAT. ANN. §§ 57-1-1 and 57-1-2, *et seq.*

315.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**NINETEENTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW N.Y.**
**GEN. BUS. LAW § 340, *et seq*.**

316.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

317.    Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. *See* N.Y. GEN. BUS. LAW § 340(1).

318.    Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products within the State of New York during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

319.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.Y. GEN. BUS. LAW § 340(6).

320.    Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of POC Diagnostic Products and restrained competition in the free exercise of the conduct of the business of POC Diagnostic Products within the intrastate commerce of New York, in violation of N.Y. GEN. BUS. LAW § 340, *et seq*.

321.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. GEN. BUS. LAW §349, *et seq*.

322.    Pursuant to New York General Business Law § 340(5), counsel for Plaintiffs has sent letters by certified mail, return receipt requested, to the Attorney General of New York, informing the Attorney General of the existence of this Class Action Complaint, identifying the relevant state antitrust provisions, and enclosing a copy of the original complaints filed by plaintiffs.

**TWENTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES,**
**N.C. GEN. STAT. § 75-1, *et seq.***

323.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

324.    Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

325.    Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

326.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within North Carolina

327.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

328.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

329.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

330.    By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available, including treble damages, under N.C. GEN. STAT. § 75-1, *et seq*.

**TWENTY-FIRST CLAIM FOR RELIEF**
**VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT,**
**N.D. CENT. CODE § 51-08.1-01, *et seq.***

331.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

332.    The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. *See* N.D. CENT. CODE § 51-08.1-01, *et seq.*

333.    Members of the Class purchased IDEXX POC Diagnostic Products within the State of North Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

334.    Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. CENT. CODE § 51- 08.1-08.

335.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within North Dakota.

336.    Defendants established, maintained, or used a monopoly, or attempted to do so, a substantial part of which occurred within North Dakota, for the purposes of excluding competition or controlling, fixing or maintaining prices for POC Diagnostic Products, in violation of N.D. CENT. CODE §§ 51-08.1-02, 03.

337.    Defendants' violations of North Dakota law were flagrant.

338.    Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

339.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief available under N.D. CENT. CODE § 51-08.1-01, *et seq.*

**TWENTY-SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**OR. REV. STAT. § 646.705, *et seq.***

340.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

341.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." OR. REV. STAT. § 646.715(1).

342.    Members of the Class purchased IDEXX POC Diagnostic Products within the State of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

343.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. OR. REV. STAT. § 646.780(1)(a).

344.    Defendants contracted, combined, or conspired in restraint of trade or commerce of POC Diagnostic Products, and monopolized or attempted to monopolize the trade or commerce of POC Diagnostic Products, in violation of Or. Rev. Stat. § 646.705, *et seq. See* OR. REV. STAT. §§ 646.725-730.

345.    Plaintiffs and members of the Class were injured with respect to purchases of POC Diagnostic Products within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**TWENTY-THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,**
**6 R.I. GEN. LAWS § 6-36-1, *et seq.***

346.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

347.    The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade and monopolistic practices" that hamper, prevent or decrease competition. 6 R.I. GEN. LAWS § 6-36-2(a)(2).

348.    Plaintiffs and members of the class purchased IDEXX POC Diagnostic Products within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

349.    Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. GEN. LAWS § 6-36-11(a).

350.    Defendants contracted, combined and conspired in restraint of trade of POC Diagnostic Products within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of POC Diagnostic Products for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of 6 Rhode Island General Laws § 6-36-1, *et seq*.

351.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

352.    In conjunction with the filing of this Complaint, Plaintiffs have mailed a copy of this Complaint to the Rhode Island Attorney General in accordance with R.I. GEN. LAWS § 6-36-21. Plaintiffs will file proof of such service with the Court.

**TWENTY-FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE,**
**S.D. CODIFIED LAWS § 37-1-3.1, *et seq*.**

353.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

354.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. CODIFIED LAWS §§ 37-1-3.1, 3.2.

355.    Members of the Class purchased IDEXX POC Diagnostic Products within the State of South Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX Diagnostic Products would have been lower, in an amount to be determined at trial.

356.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. *See* S.D. CODIFIED LAWS § 37-1-33.

357.    Defendants contracted, combined or conspired in restraint of trade or commerce of POC Diagnostic Products within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of POC Diagnostic Products within the intrastate commerce of South Dakota, in violation of S.D. CODIFIED LAWS § 37-1, *et seq*.

358.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**TWENTY-FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,**
**TENN. CODE § 47-25-101, *ET SEQ*.**

359.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

360.    The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* TENN. CODE, § 47-25-101.

361.    Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

362.    Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, *et seq.*

363.    Defendants' conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendant's combination or conspiracy had the following effects: (1) price competition for POC Diagnostic Products was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for POC Diagnostic Products were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supra-competitive, artificially inflated prices for POC Diagnostic Products.

364.    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as IDEXX POC Diagnostic Products were sold in Tennessee.

365.    Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products within the State of Tennessee during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

366.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs and the Class have been injured in their business and property and are threatened with further injury.

367.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

**TWENTY-SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH ANTITRUST ACT,**
**UTAH CODE ANN. § 76-10-3101, *et seq*.**

368.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

369. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." UTAH CODE ANN. § 76-10-3102.

370. Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

371. Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. UTAH CODE ANN. § 76-10-3109(1)(a).

372. Defendants contracted, combined or conspired in restraint of trade or commerce of POC Diagnostic Products, and monopolized or attempted to monopolize trade or commerce of POC Diagnostic Products, in violation of UTAH CODE ANN. § 76-10-3101, *et seq.*

373. Plaintiffs and members of the Class who are either Utah residents or Utah citizens were injured with respect to purchases of IDEXX POC Diagnostic Products in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

374. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Utah Attorney General in accordance with UTAH CODE ANN. § 76-10-3109(9).

**TWENTY-SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,**
**W. VA. CODE § 47-18-1, *et seq.***

375. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

376. The violations of law set forth above also constitute violations of Section 47-18-1 of the West Virginia Code.

377. During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia and the establishment or maintenance

of a monopoly for the purpose of excluding competition, in violation of W. VA. CODE §§ 47-18-3; 47-18-4.

378.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within West Virginia.

379.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within West Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the POC Diagnostic Products market.

380.    Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products within the State of West Virginia during the Class Period. But for Defendant's conduct set forth herein, the price of IDEXX Diagnostic Products would have been lower, in an amount to be determined at trial.

381.    Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. VA. CODE St. R. 142-9-2 ("Any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1, et seq., may bring an action for damages under W. Va. Code § 47-18-9.").

382.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

383.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property in that they paid more for IDEXX POC Diagnostic Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

384.    Members of the Class have standing to pursue their claims under, *inter alia*, W. VA. CODE § 47-18-9.

385.     As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and members of the Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

**TWENTY-EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE WISCONSIN ANTITRUST ACT,**
**WIS. STAT. § 133.01, *et seq.***

386.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

387.     Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." WIS. STAT. § 133.01.

388.     Plaintiffs and members of the class purchased IDEXX POC Diagnostic Products within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

389.     Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. *See* WIS. STAT. § 133.18(1)(a).

390.     Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of POC Diagnostic Products, with the intention of injuring or destroying competition therein, in violation of WIS. STAT. § 133.01, *et seq.*

391.     Plaintiffs and members of the Class were injured with respect to purchases of IDEXX POC Diagnostic Products in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for IDEXX POC Diagnostic Products in Wisconsin.

392.     Accordingly, Plaintiffs and members of the Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

393.    Defendants' anticompetitive activities have directly, foreseeably, and proximately caused injury to Plaintiffs and members of the class in the United States. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced POC Diagnostic Products from Defendants, and (2) paying higher prices for IDEXX POC Diagnostic Products than they would have in the absence of Defendants' conduct. These injuries are of the type of the laws of the above States were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

394.    Defendants are jointly and severally liable for all damages suffered by Plaintiffs and members of the Class.

### VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

395.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

396.    Defendants above-described scheme and conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of the state consumer protection statutes set forth below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, Plaintiffs and the class paid higher prices for IDEXX POC Diagnostic Products than they should have.

397.    The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiff and Class members could not reasonably have avoided injury from Defendants' wrongful conduct.

398.    Plaintiffs and members of the Class purchased goods, namely IDEXX POC Diagnostic Products, primarily for personal, family, or household purposes.

399.    There was and is a gross disparity between the price that Plaintiffs and the Class members paid for IDEXX POC Diagnostic Products and the value they received.

400.    The following Twenty-Ninth through Forty-Third claims for relief are pleaded under the consumer protection or similar laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the State Class.

**TWENTY-NINTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE § 17200, *et seq.* (THE "UCL")**

401.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

402.    The violations of federal antitrust law set forth above also constitute violations of Section 17200*, et seq.* of the California Business and Professions Code.

403.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

404.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

405.    Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of Section 16720, *et seq.*, of California Business and Professions Code, set forth above.

406.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

407.    Plaintiffs and members of the Class are entitled to, *inter alia*, full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

408.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

409.   The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause members of the Class to pay supra-competitive and artificially-inflated prices for IDEXX POC Diagnostic Products sold in the State of California. Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

410.   As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code Sections 17203 and 17204.

**THIRTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT, D.C. CODE § 28-3901, *et seq.***

411.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

412.   Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products for personal, family, or household purposes.

413.   By reason of the conduct alleged herein, Defendants have violated D.C. CODE § 28-3901, *et seq.*

414.   Defendants are "merchants" within the meaning of D.C. CODE § 28- 3901(a)(3).

415.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the POC Diagnostic Products market.

416.   Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

417.   Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

418.   As a direct and proximate cause of defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

419.   By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. CODE § 28-3901, *et seq.*

**THIRTY-FIRST CLAIM FOR RELIEF**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,**
**FLA. STAT. § 501.201(2), *et seq.***

420.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

421.   The Florida Deceptive & Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. FLA. STAT. § 501.204(1).

422.   The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202(2).

423.   A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

424.   Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this complaint. *See* FLA. STAT. § 501.211(1) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

425.     Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

426.     Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Florida.

427.     Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for POC Diagnostic Products, including in the Analyzer & Consumables submarket and the Rapid Test Kit submarket, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as July 26, 2018 and continuing through the date of this filing.

428.     Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

429.     Defendants' unlawful conduct substantially affected Florida's trade and commerce.

430.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property by virtue of overcharges for IDEXX POC Diagnostic Products and are threatened with further injury.

431.     By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief pursuant to Fla. Stat. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to FLA. STAT. § 501.211.

## THIRTY-SECOND CLAIM FOR RELIEF
## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS. CH. 93A § 1, *et seq.*

432.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

433.     By reason of the conduct alleged herein, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A § 2, *et seq*.

434.     Plaintiffs and members of the Class purchased IDEXX POC Diagnostic Products within the Commonwealth of Massachusetts during the Class Period. But for Defendants' conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

435.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Massachusetts, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the POC Diagnostic Products market.

436.     Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

437.     Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

438.     Plaintiffs and members of the Class purchased goods, namely IDEXX POC Diagnostic Products, primarily for personal, family, or household purposes.

439.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

440.     By reason of the foregoing, Plaintiffs and the Class are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under Massachusetts General Laws ch. 93A § 9.

441.     The demand letter requirement of Section 9 of Massachusetts General Laws Annotated Chapter 93A does not apply as to IDEXX because, upon information and belief, IDEXX has not identified a place of business or assets within Massachusetts.

**THIRTY-THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1970,**
**MONT. CODE, §§ 30-14-103, *et seq.*, AND §§ 30-14-201, *et seq.***

442.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

443.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, MONT. CODE, §§ 30-14-103, *et seq.*, and 30-14-201, *et seq.*

444.    Defendants' unlawful conduct had the following effects: (1) POC Diagnostic Products price competition was restrained, suppressed, and eliminated throughout Montana; (2) POC Diagnostic Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supra-competitive, artificially inflated prices for POC Diagnostic Products.

445.    Plaintiffs and members of the Class purchased goods, namely IDEXX POC Diagnostic Products, primarily for personal, family, or household purposes.

446.    During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

447.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE, §§ 30-14-103, *et seq.*, and 30-14-201, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**THIRTY-FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT,**
**NEB. REV. STAT. § 59-1602, *et seq.***

448.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

449.   By reason of the conduct alleged herein, Defendants have violated NEB. REV. STAT. § 59-1602, *et seq*.

450.   Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. *See* NEB. REV. STAT. § 59-1609.

451.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Nebraska.

452.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

453.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

454.   Defendants' conduct had a direct or indirect impact upon Plaintiffs and members-of-the-Class's ability to protect themselves.

455.   Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

456.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

457.   By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available under NEB. REV. STAT. § 59-1614.

**THIRTY-FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT,**
**NEV. REV. STAT. § 598.0903, *et seq*.**

458.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

459.    By reason of the conduct alleged herein, Defendants have violated Nev. Rev. Stat. § 598.0903, *et seq*.

460.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

461.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Nevada.

462.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the POC Diagnostic Products market.

463.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

464.    Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

465.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

466.    Defendants' conduct was willful.

467.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have been injured in their business or property and are threatened with further injury.

468.    By reason of the foregoing, the Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under NEV. REV. STAT. § 598.0993.

**THIRTY-SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT,**
**N.H. REV. STAT. ANN. tit. XXXI, § 358-A:1, *et seq.***

469.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

470.    By reason of the conduct alleged herein, defendants have violated N.H. REV. STAT. tit. XXXI, § 358-A:1, *et seq*.

471.    Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *See LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

472.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within New Hampshire.

473.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

474.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

475.    Defendants' conduct was willful and knowing.

476.    Defendants' conduct had a direct or indirect impact upon Plaintiffs' and members of the Class's ability to protect themselves.

477.    Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

478.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

479.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief available under New Hampshire Revised Statutes §§ 358-A:10 and 358-A:10-a.

**THIRTY-SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT,**
**N.M. STAT. ANN. § 57-12-1, *et seq.***

480.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

481.    By reason of the conduct alleged herein, Defendants have violated N.M. STAT. § 57-12-3, *et seq.*

482.    Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products Market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within New Mexico.

483.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Market and Submarkets, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the POC Diagnostic Products market.

484.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

485.    Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

486.    Defendants' conduct constituted "unconscionable trade practices" in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Class members and the price paid by them for IDEXX POC Diagnostic Products as set forth in N.M. STAT. § 57- 12-2E.

487.    Defendants' conduct was willful.

488.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

489.    By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. STAT. § 57-12-10.

## THIRTY-EIGHTH CLAIM FOR RELIEF
## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. § 75-1.1, *et seq.*

490.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

491.    By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat. § 75-1.1, *et seq*. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

492.    Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within North Carolina.

493.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

494.    Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

495.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

496.    Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

497.    As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

498.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including treble damages under N.C. GEN. STAT. § 75-16.

**THIRTY-NINTH CLAIM FOR RELIEF**
**VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT,**
**R.I. GEN. LAWS § 6-13.1-1, *et seq.***

499.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

500.    By reason of the conduct alleged herein, Defendants have violated R.I. GEN. LAWS § 6-13.1-1, *et seq*.

501.    Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

502.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Rhode Island.

503.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Rhode Island, for the purpose of controlling, fixing, or maintaining prices in the POC Diagnostic Products market.

504.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

505.    Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

506.    Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

507.    Defendants' conduct was willful.

508.    Defendants' deception constitutes information necessary to Plaintiffs and members of the Class relating to the cost of IDEXX POC Diagnostic Products purchased.

509.    Plaintiffs and members of the Class purchased goods, namely IDEXX POC Diagnostic Products, primarily for personal, family, or household purposes.

510.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

511.    By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. GEN. LAWS § 6-13.1-5.2.

**FORTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT,**
**S.C. CODE ANN. §§ 39-5-10, *et seq*.**

512.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

513.    By reason of the conduct alleged herein, Defendants have violated S.C. CODE ANN. § 39-5-10, *et seq*.

514.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within South Carolina.

515.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

516.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

517.    Defendants' conduct had a direct or indirect impact upon Plaintiffs' and members of the Class's ability to protect themselves.

518.    Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

519.    Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as at least thousands of members of the public purchase IDEXX POC Diagnostic Products.

## FORTY-FIRST CLAIM FOR RELIEF
### VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT, UTAH CODE ANN. §§ 13-11-1, *ET SEQ.*

520.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

521.    By reason of the conduct alleged herein, Defendants have violated UTAH CODE ANN. §§ 13-11-1, *et seq.*

522.    Defendants are a supplier within the meaning of UTAH CODE ANN. §§ 13-11-3.

523.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Utah.

524.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the POC Diagnostic Products market.

525.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

526.    Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions within the meaning of UTAH CODE ANN. §§ 13-11-3.

527. Defendants knew or had reason to know that their conduct was unconscionable.

528. Defendants' unlawful conduct substantially affected Utah's trade and commerce.

529. Plaintiffs and members of the Class purchased goods, namely IDEXX POC Diagnostic Products, primarily for personal, family, or household purposes.

530. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

531. By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to UTAH CODE ANN. §§ 13-11-19(5) and 13-11-20.

### FOURTY-SECOND CLAIM FOR RELIEF
### VIOLATION OF THE UTAH UNFAIR PRACTICES ACT,
### UTAH CODE ANN. §§ 13-5-1, *ET SEQ.*

532. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

533. By reason of the conduct alleged herein, Defendants have violated UTAH CODE ANN. §§ 13-5-1, *et seq.*

534. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Utah.

535. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the POC Diagnostic Products market.

536. Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

537.   Defendants' unlawful conduct substantially affected Utah's trade and commerce.

538.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

539.   By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including actual damages or $2000 per Class member, whichever is greater, plus reasonable attorney's fees under UTAH CODE ANN. §§ 13-5-14, *et seq.*

**FORTY-THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE VERMONT CONSUMER FRAUD ACT,**
**VT. STAT. ANN. TIT. 9, CH. 63 §2451,** *et seq.*

540.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

541.   By reason of the conduct alleged herein, Defendants have violated VT. STAT. ANN. tit. 9, § 2451, *et seq.*

542.   Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, *inter alia*, unfair methods competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. *See* VT. STAT ANN. tit. 9, § 2453(a).

543.   Members of the Class purchased IDEXX POC Diagnostic Products within the State of Vermont during the Class Period. But for Defendants' conduct set forth herein, the price of IDEXX POC Diagnostic Products would have been lower, in an amount to be determined at trial.

544.   Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this complaint. VT. STAT. ANN. TIT. 9, § 2465(b); *see also Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

545.   Defendants competed unfairly by restraining trade as set forth herein, in violation of VT. STAT. tit. 9, § 2453, *et seq.*

546.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the POC Diagnostic Products market,

including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Vermont.

547.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the POC Diagnostic Products market, including the Analyzer & Consumables submarket and the Rapid Test Kit submarket, a substantial part of which occurred within Vermont, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the POC Diagnostic Products Market.

548.    Defendants' violations of Vermont law were flagrant.

549.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

550.    Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

551.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

552.    Plaintiffs and members of the Class were injured with respect to purchases of IDEXX Diagnostic Products in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

## VIII.  **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully ask the Court for a judgment that:

1.    Certifies the Class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) and directs that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declares Plaintiffs as representatives of the Class;

2.    Appoints Plaintiffs and their attorneys as class representatives and class counsel, respectively;

3.    Enters judgment against Defendants, and in favor of Plaintiffs and the Class, holding Defendants liable for the antitrust violations alleged;

4.      Awards a declaratory judgment that IDEXX's use of its dominant position in the Relevant Market and Submarkets to cause veterinary practices to enter into long-term, exclusive, contracts was done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the U.S. market for POC Diagnostic Products in violation of the Sherman Act, §§ 1-2.

5.      Grants permanent injunctive relief:

a.      enjoining IDEXX from engaging in future anticompetitive conduct with the purpose or effect of preventing actual or potential rivals from gaining a foothold in the Relevant Market and Submarkets and eliminating or impairing the price discipline that would come from free and fair competition; and

b.      requiring IDEXX to take affirmative steps to dissipate the continuing effects of its prior unlawful conduct;

6.      Awards Plaintiffs and the Class actual, double, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged herein, plus interest in accordance with law;

7.      Awards such equitable relief as is necessary to correct for the anticompetitive market effects caused by Defendant's unlawful conduct, including disgorgement, restitution, and the creation of a constructive trust;

8.      Awards Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

9.      Directs such further relief as it may deem just and proper.

## IX.   <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

1
2

Dated:  July 25, 2022                Respectfully submitted,

3                                    By: */s/ Joshua P. Davis*

4                                    Joshua P. Davis (SBN 271725)
                                     **BERGER MONTAGUE PC**
5                                    59A Montford Avenue
                                     Mill Valley, CA 94941
6                                    Telephone: (800) 424-6690
                                     jdavis@bm.net
7
                                     Eric L. Cramer (*pro hac vice application forthcoming*)
8                                    Michael J. Kane (*pro hac vice application forthcoming*)
                                     Andrew C. Curley (*pro hac vice application forthcoming*)
9                                    Najah A. Jacobs (*pro hac vice application forthcoming*)
                                     **BERGER MONTAGUE PC**
10                                   1818 Market Street
                                     Suite 3600
11                                   Philadelphia, PA 19103
                                     Telephone: (215) 875-3000
12                                   ecramer@bm.net
                                     mkane@bm.net
13                                   acurley@bm.net
                                     njacobs@bm.net
14
                                     Daniel Walker (*pro hac vice application forthcoming*)
15                                   **BERGER MONTAGUE PC**
                                     2001 Pennsylvania Avenue, NW
16                                   Suite 300
                                     Washington, DC 20006
17                                   Telephone: (202) 559-9745
                                     dwalker@bm.net
18
                                     Brent W. Johnson (*pro hac vice application forthcoming*)
19                                   Richard A. Koffman (*pro hac vice application forthcoming*)
20                                   Daniel McCuaig (*pro hac vice application forthcoming*)
                                     Daniel H. Silverman (*pro hac vice application forthcoming*)
21                                   Zachary Krowitz (SBN 329907)
22                                   **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                     1100 New York Ave. NW ● Fifth Floor
23                                   Washington, DC 20005
                                     (202) 408-4600
24                                   bjohnson@cohenmilstein.com
                                     rkoffman@cohenmilstein.com
25                                   dmccuaig@cohenmilstein.com
                                     dsilverman@cohenmilstein.com
26                                   zkrowitz@cohenmilstein.com

27                                   *Counsel for Plaintiffs Cam Yuen, Arrianna Garcia, Kathryn
                                     Heberling, Susan McVinney, Sunny Stimson, Ellen Berman,
28                                   Neil Murphy, Dennis Wild, Andrea Bury, Miranda Smelcer,*

*Marcia Potts, Sheryl Emerson, Chrysta Cataldo, Marlena Giga, Gina Giorgio, Michelle Carpenter, Valerie Hitz, Shavonna Armstrong, Hilary Allred, Melissa Marshall, Joseph Duncan, and Dawn Reynosa, and Proposed Co-Lead Counsel for the Class*

Jennie Lee Anderson (SBN 203586)
Lori E. Andrus (SBN 205816)
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474
jennie@andrusanderson.com
lori.andrus@andrusanderson.com

*Additional Counsel for Plaintiffs and for the Class*