GLENN D. POMERANTZ (State Bar No. 112503)
Glenn.Pomerantz@mto.com
STUART N. SENATOR (State Bar No. 148009)
Stuart.Senator@mto.com
ADAM R. LAWTON (State Bar No. 252546)
Adam.Lawton@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

STEPHEN A. HYLAS (State Bar No. 319833)
Stephen.Hylas@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Attorneys for Defendants
IDEXX Laboratories, Inc. and
IDEXX Distribution, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CAM YUEN, et al.,<br><br>      Plaintiffs,<br><br>      vs.<br><br>IDEXX LABORATORIES, INC. and IDEXX DISTRIBUTION, INC.,<br><br>      Defendants. | Case No. 3:22-cv-04297-TLT<br><br>**DEFENDANTS' MOTION TO DISMISS**<br><br>Judge:      Hon. Trina L. Thompson<br>Date:       January 24, 2023<br>Time:       2:00 P.M.<br>Ctrm:      9, 19th Floor |

## TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ........................................................1

STATEMENT OF THE ISSUES TO BE DECIDED ..........................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................1

I.    Introduction ...........................................................................................................1

II.   Background ............................................................................................................3

      A.   IDEXX Is An Industry-Leading Manufacturer Of Diagnostic Testing
           Products For Veterinarians. ......................................................................3

      B.   IDEXX Has Earned Great Success With Veterinarians. ............................4

      C.   Plaintiffs Are Pet Owners Who Do Not Purchase IDEXX Products. ........6

      D.   Plaintiffs' Complaints Center On The Relationship Between IDEXX And
           Veterinary Practices In Which Plaintiffs Do Not Participate. ...................7

      E.   Plaintiffs' Allegations Of Injury Are Conclusory. ...................................7

III.  Argument ...............................................................................................................8

      A.   Plaintiffs' Federal Claims Fail Because Plaintiffs Lack Antitrust Standing. ............8

           1.   Plaintiffs Lack Antitrust Standing Because They Do Not Participate
                In The Relevant Market .................................................................10

           2.   The "Exceedingly Narrow" Exception For Injuries Occurring In
                "Inextricably Intertwined" Markets Does Not Apply. ...................12

           3.   Veterinarians—Not Pet Owners—Would Be The Natural Plaintiffs
                To Litigate Any Issues Regarding Their Contracts With IDEXX. ...........13

           4.   Plaintiffs Lack Antitrust Standing Because Their Alleged Injuries
                Are Speculative. ............................................................................15

      B.   Plaintiffs' State Law Claims Fail Because Plaintiffs Lack Antitrust
           Standing. ................................................................................................16

           1.   The State Law Antitrust Claims Fail For Lack Of Antitrust Standing ............16

           2.   Each Of The Consumer-Protection Claims Also Fails For Lack Of
                Antitrust Standing. .......................................................................20

1

C.     The Court Should Alternatively Dismiss The Claims Under The Laws Of
        States Where No Named Plaintiff Resides For Lack Of Article III Standing..........21

D.     Plaintiffs' Consumer Protection Claims Fail For Additional Reasons. ...................22

IV.    Conclusion........................................................................................................................23

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*In re Aggrenox Antitrust Litig.*,
2016 WL 4204478 (D. Conn. Aug. 9, 2016) ........................................................20

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ...............................................................9, 10, 16

*In re Apple & AT&TM Antitrust Litig.*,
596 F. Supp. 2d 1288 (N.D. Cal. 2008) ..............................................................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...............................................................................................8

*Associated Gen. Contractors of California, Inc. v. Cal. State Council of
Carpenters*,
459 U.S. 519 (1983) ...........................................................................................2, 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................................................8

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021)..........................................................8, 10, 13, 14

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
2015 WL 3988488 (N.D. Ill. June 29, 2015) ...............................................20, 21

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
362 F. Supp. 3d 510 (N.D. Ill. 2019) ......................................................17, 18, 20

*In re Ditropan XL Antitrust Litig.*,
529 F. Supp. 2d 1098 (N.D. Cal. 2007) ...........................................................3, 22

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007) .....................................................17, 18, 19

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust
Litig.*,
28 F.4th 42 (9th Cir. 2022).....................................................................................8

*Eagle v. Star-Kist Foods, Inc.*,
812 F.2d 538 (9th Cir. 1987)..........................................................2, 10, 11, 14, 15

*Easter v. Am. W. Fin.*,
381 F.3d 948 (9th Cir. 2004).................................................................................22

1

*Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.*,
2      788 F.2d 574 (9th Cir. 1986) ..................................................................................12

3 *Feitelson v. Google, Inc.*,
     80 F. Supp. 3d 1019 (N.D. Cal. 2015) ...............................................9, 10, 11, 12, 13
4

*In re Flash Memory Antitrust Litig.*,
5      643 F. Supp. 2d 1133 (N.D. Cal. 2009) .............................................................13, 22

6 *In re Generic Pharms. Pricing Antitrust Litig.*,
     368 F. Supp. 3d 814 (E.D. Pa. 2019) ....................................................................23
7

*In re Graphics Processing Units Antitrust Litig.*,
8      527 F. Supp. 2d 1011 (N.D. Cal. 2007) .................................................................22

9 *In re Graphics Processing Units Antitrust Litig.*,
     540 F. Supp. 2d 1085 (N.D. Cal. 2007) .................................................................19
10

11 *Guerra v. Dematic Corp*,
     2020 WL 8831583 (D. Nev. Sept. 9, 2020) ...........................................................21
12

13 *Illinois Brick Co. v. Illinois*,
     431 U.S. 720 (1977) ................................................................................................9

14 *Jones v. Micron Tech., Inc.*,
15      400 F. Supp. 3d 897 (N.D. Cal. 2019) ....................................................................9

16 *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
     383 F. Supp. 3d 187 (S.D.N.Y. 2019) ........................................................14, 15, 16
17

18 *Key v. Sprout Foods, Inc.*,
     2021 WL 4061735 (N.D. Cal. Sept. 7, 2021) ...........................................................3

19 *Lewis v. Casey*,
20      518 U.S. 343 (1996) ..............................................................................................22

21 *In re Lithium Ion Batteries Antitrust Litig.*,
     2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ...........................................................13
22

*Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*,
23      2014 WL 4774611 (N.D. Cal. Sept. 22, 2014) ...................................................17, 22

24 *Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*,
     2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) .........................................................10
25

26 *Oliver v. Am. Express Co.*,
     2020 WL 2079510 (E.D.N.Y. Apr. 30, 2020) ..........................................................21
27

*In re Optical Disk Drive Antitrust Litig.*,
28      2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ...........................................................22

*Ostrofe v. H.S. Crocker Co.*,
  740 F.2d 739 (9th Cir. 1984)............................................................................12

*Pardini v. Unilever United States, Inc.*,
  961 F. Supp. 2d 1048 (N.D. Cal. 2013) .........................................................22

*Presti v. Toyota Motor Sales U.S.A, Inc.*,
  2018 WL 792035 (D. Mass. Feb. 8, 2018) ....................................................21

*Reid v. LVNV Funding, LLC*,
  2016 WL 247571 (D. Utah Jan. 20, 2016) .....................................................23

*Ryman v. Sears, Roebuck & Co.*,
  505 F.3d 993 (9th Cir. 2007)..........................................................................18

*Salveson v. JP Morgan Chase & Co.*,
  166 F. Supp. 3d 242 (E.D.N.Y. 2016)......................................................11, 12

*Shaw v. Marriott Int'l, Inc.*,
  605 F.3d 1039 (D.C. Cir. 2010) .....................................................................23

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
  737 F. Supp. 2d 380 (E.D. Pa. 2010) .............................................................23

*Snap Advances LLC v. SHG of Ill., LLC*,
  2019 WL 7505555 (D. Utah Feb. 12, 2019) ..................................................23

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013)........................................................................8, 10

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  2010 WL 5094289 (N.D. Cal. Dec. 8, 2010) .................................................20

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003)............................................................................5

*In re Wellbutrin XL Antitrust Litig.*,
  260 F.R.D. 143 (E.D. Pa. 2009) ...............................................................21, 23

*In re Wellpoint, Inc., Out-of-Network UCR Rates Litig.*,
  903 F. Supp. 2d 880 (C.D. Cal. 2012) ...........................................................20

**STATE CASES**

*Cellular Plus, Inc. v. Superior Ct.*,
  14 Cal. App. 4th 1224 (1993)...........................................................................9

*Crouch v. Crompton Corp.*,
  2004 WL 2414027 (N.C. Super. Oct. 28, 2004) ............................................18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Durell v. Sharp Healthcare*,
    183 Cal. App. 4th 1350 (2010) ...................................................................................23

*Fucile v. Visa U.S.A., Inc.*,
    2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004) ...................................................20

*George v. George F. Berkander, Inc.*,
    169 A.2d 370 (R.I. 1961) .........................................................................................23

*Hershenow v. Enter. Rent-A-Car Co. of Bos., Inc.*,
    840 N.E.2d 526 (Mass. 2006) ..................................................................................21

*Kanne v. Visa U.S.A., Inc.*,
    723 N.W.2d 293 (Neb. 2006)......................................................................17, 18, 20

*Lorix v. Crompton Corp.*,
    736 N.W.2d 619 (Minn. 2007) ............................................................................18, 19

*Matthews v. Berryman*,
    637 P.2d 822 (Mont. 1981) ......................................................................................23

*Naas-Romero v. Visa USA, Inc.*,
    279 P.3d 772 (N.M. Ct. App. 2012)........................................................................18

*Southard v. Visa U.S.A. Inc.*,
    734 N.W.2d 192 (Iowa 2007)...................................................................................17

*State v. Int'l Collection Serv.*,
    594 A.2d 426 (Vt. 1991) ..........................................................................................23

*Teague v. Bayer AG*,
    671 S.E.2d 550 (N.C. Ct. App. 2009) ......................................................................18

*Vinci v. Waste Mgmt., Inc.*,
    36 Cal. App. 4th 1811 (1995)...................................................................................18

**FEDERAL STATUTES**

15 U.S.C. § 1 ...................................................................................................................8

15 U.S.C. § 2 ...................................................................................................................8

**FEDERAL RULES**

Fed. R. Civ. P. 12(b)(1)...........................................................................................21, 23

Fed. R. Civ. P. 12(b)(6).............................................................................................8, 23

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2          PLEASE TAKE NOTICE that, on Tuesday, January 24, 2023, at 2:00 P.M., or as soon

3     thereafter as the matter may be heard, in Courtroom 9 (19th Floor) of this Court, located at 450

4     Golden Gate Avenue, San Francisco, CA 94102, Defendants IDEXX Laboratories, Inc. and

5     IDEXX Distribution, Inc. (together, "IDEXX") will and hereby do move the Court for an order to

6     dismiss this case pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(b)(1).

7          This Motion is based upon the Memorandum of Points and Authorities, all other materials

8     supporting this Motion, all pleadings on file, and any other matter submitted before or at the

9     hearing.

10

## STATEMENT OF THE ISSUES TO BE DECIDED

11          1.     Whether the Court should dismiss Plaintiffs' federal antitrust claims under Fed. R.

12     Civ. P. 12(b)(6) for lack of antitrust standing.

13          2.     Whether the Court should dismiss Plaintiffs' state-law claims under Fed. R. Civ. P.

14     12(b)(6) for lack of antitrust standing.

15          3.     Whether the Court should dismiss the claims asserted under the laws of states in

16     which no named plaintiff resides or alleges to have been injured, under Fed. R. Civ. P. 12(b)(1) for

17     lack of Article III standing.

18          4.     Whether the Court should dismiss Plaintiffs' state-law consumer protection claims

19     under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted.

20

## MEMORANDUM OF POINTS AND AUTHORITIES

21     **I.     Introduction**

22          Plaintiffs in this case assert antitrust claims against IDEXX,[1] a group of companies that

23     manufacture and supply testing products that veterinarians use to help diagnose and treat pets.

24     Plaintiffs are not veterinarians.  Plaintiffs do not purchase anything from IDEXX or contract with

25     IDEXX.  Nor do they run veterinary practices or purchase testing products for veterinary practices.

26

27     _____

[1] Because the Complaint alleges that IDEXX Laboratories, Inc. and IDEXX Distribution, Inc.
28     should be considered together, this motion refers to them jointly as "IDEXX."

1  Rather, Plaintiffs are pet owners.  They complain that veterinarians are charging too much for

2  administering diagnostic tests during office visits, and they speculate that certain terms in some

3  veterinarians' contracts with IDEXX for point-of-care diagnostic testing products, and the manner

4  in which IDEXX enforces those terms with veterinarians, make it difficult as a practical matter for

5  some veterinarians to switch to using a competing supplier's testing products.  According to

6  Plaintiffs, this results in veterinarians' paying a "premium" price for IDEXX testing products, and

7  the veterinarians allegedly then choose to charge plaintiffs more for their services.  Plaintiffs assert

8  that IDEXX's entering into contracts with those veterinarians who choose to purchase IDEXX

9  diagnostics under a contractual arrangement constitutes a violation of the antitrust laws.

10  But Plaintiffs are not the proper parties to bring an antitrust challenge to IDEXX's

11  contractual relationships with some veterinarians—if indeed the contracts affect veterinarians as

12  alleged, it is the veterinarians who would be the proper plaintiffs.  Veterinarians (and veterinary

13  practice owners) are the ones who participate in the point-of-care diagnostic products marketplace,

14  in a relationship with IDEXX.  They are the ones who know how contracts work for their practices

15  and how they affect their delivery of veterinary care to pets and pet owners.  They are most

16  directly impacted by the alleged violations in the Complaint.  The doctrine of antitrust standing

17  provides that antitrust challenges to particular conduct should be brought by those most directly

18  impacted by the alleged violation, not by those further removed who allegedly suffered the ripple

19  effects of the conduct.  *See Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541–42 (9th Cir. 1987).

20  Where plaintiffs are not even participants in the marketplace in which the alleged antitrust

21  violation occurred—here, the POC Diagnostic Products market, according to the Complaint—they

22  lack antitrust standing as a matter of law.  *See id.*  Because the Plaintiffs here are pet owners who

23  neither purchase nor use the POC Diagnostics Products in question, the Court should dismiss their

24  antitrust challenge for lack of antitrust standing.

25  Plaintiff's Sherman Act claims fail directly under the Supreme Court's decision in

26  *Associated Gen. Contractors of California, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519

27  (1983) [hereinafter "*AGC*"], which sets forth the basic test for antitrust standing.  Plaintiffs' state

28  law antitrust claims fail because either the *AGC* rule or an analogous test should be found to apply

MOTION TO DISMISS

1  in every state with antitrust laws invoked by the Plaintiffs.  *See infra* at pp. 16–20.  And Plaintiffs'

2  claims under state consumer protection laws fail for largely the same reason, because they are

3  based on the same alleged conduct and same legal theories as the Sherman Act claims.  *See infra*

4  at pp. 20–21.

5        Independently, Plaintiffs' claims under the laws of 16 states also fail for lack of Article III

6  standing—because none of the named Plaintiffs lives in any of those states or paid for veterinary

7  services in any of those states.  *See In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098,

8  1106–07 (N.D. Cal. 2007).  *See infra* at pp. 21–22.

9  **II.**  **Background**

10        Because this is a motion to dismiss, the discussion in this motion is based on the

11  allegations in the Complaint.  While IDEXX will disprove many aspects of the Complaint should

12  this case proceed, this motion shows that, even accepting the allegations as true, this litigation

13  should be dismissed.[2]

14        **A.**  **IDEXX Is An Industry-Leading Manufacturer Of Diagnostic Testing Products**

15            **For Veterinarians.**

16        IDEXX is a leading provider of products and services sold to veterinary practices to help

17  veterinarians diagnose health conditions in pets.  *See, e.g.*, ECF No. 1, Compl. ¶ 2.  The Complaint

18  focuses on IDEXX's point-of-care products—what the Complaint calls "POC Diagnostic

19  Products"—which veterinarians use to conduct "in-office" testing during routine or emergency

20  visits.  *Id.* ¶¶ 1–2, 57.  POC Diagnostic Products, as defined in the Complaint, include:

21  (1) "analyzers," which are large instruments costing between "$12,000" and "$30,000" that

22  veterinarians use to run blood chemistry tests; (2) "consumables," which are single-use items such

23  as slides and reagents that are loaded into analyzers for testing; and (3) "rapid test kits," which are

24  also single-use and do not always require the veterinarian to use with an analyzer.  *Id.* ¶¶ 57, 103.

25

26  _____

    [2] The Court should first decide IDEXX's concurrently-filed motion to transfer this case to the

27  District of Maine.  If this Court grants the transfer motion, IDEXX should be given leave to refile
the current motion in the transferee court.  *See Key v. Sprout Foods, Inc.*, 2021 WL 4061735, at *1

28  (N.D. Cal. Sept. 7, 2021).

1   The innovation, design and manufacturing of all these products "require substantial capital

2   investment" by IDEXX.  *Id.* ¶ 86.  As explained further below, in a program popular with

3   veterinarians, IDEXX enables veterinarians, at their election, to obtain analyzers with no up-front

4   payment, in exchange for the veterinarians' commitment to purchase a certain amount of

5   consumables for a fixed period of time.  *See infra* at pp. 4–5.

6        In this industry, analyzers are designed to work with consumables from the same

7   manufacturer.  Compl. ¶¶ 10, 57, 60.  Thus, IDEXX analyzers work with IDEXX slides, just as

8   analyzers from its competitors, Zoetis, Inc. ("Zoetis") and Heska Corporation ("Heska"), work

9   with their respective consumables.  *Id.*  IDEXX analyzers and other POC Diagnostic Products also

10  integrate with various Practice Information Management Systems and other IT tools, including

11  IDEXX software.  *Id.* ¶ 62.

12       **B.      IDEXX Has Earned Great Success With Veterinarians.**

13       IDEXX has had great success with veterinarians.  Plaintiffs claim IDEXX currently

14  supplies approximately 70% of POC Diagnostic Products in the United States.  *Id.* ¶¶ 76, 81.

15  Zoetis and Heska each supplies approximately 15% of those products in the United States.  *Id.*

16  The Complaint focuses on two IDEXX programs that many veterinarians choose.

17       The first involves IDEXX's providing veterinary practices with credits, known as IDEXX

18  Points, that can be used toward future purchases of IDEXX products and services.  *Id.* ¶ 102.  In

19  turn, the veterinarian commits for a period of time to purchase, or redeem IDEXX Points for,

20  annual amounts of IDEXX products and services, such as instrument consumables or rapid test

21  kits, and can also use those points to purchase analyzers that would otherwise cost tens of

22  thousands of dollars.  *Id.* ¶¶ 102–103.  Sometimes IDEXX offers veterinary practices "zero

23  purchase requirements in the first year."  *Id.* ¶ 113.  Unused IDEXX Points must be paid back if a

24  veterinary practice chooses to switch to a competing test provider.  *Id.* ¶ 102.

25       The second program is called the IDEXX 360 Program.  The IDEXX 360 Program is a

26  business partnership under which the veterinarian receives IDEXX analyzers for little or no up-

27  front payment.  IDEXX Laboratories, Inc. Annual Report (Form 10-K), at 34–35 (Dec. 31, 2021)

28

[hereinafter "Form 10-K"].[3]  As noted, these can be large machines that would otherwise cost tens of thousands of dollars.  Compl. ¶ 103.  In exchange, veterinarians agree to purchase a specified volume of IDEXX products (which can be met through purchases of analyzers, consumables and rapid test kits) over a specified term.  *Id.* ¶¶ 102–106; Form 10-K, at 34–35.  If a veterinary practice chooses to terminate its contract prematurely, it is required to satisfy the remainder of its financial commitment.  *Id.* ¶ 105.

IDEXX's arrangements with veterinarians are not unique.  The Complaint alleges that Zoetis similarly offers up-front consideration to veterinarians that can be used toward the cost of an analyzer, and/or requires veterinarians to purchase a specified amount of its products and services.  *Id.* ¶¶ 131–132.

The Complaint does not allege any deception in IDEXX's negotiating or administering its contracts.  The Complaint also does not allege there is any contractual restriction on a veterinarian's purchasing equipment and/or consumables from Zoetis or Heska while also contracting with IDEXX.  And the Complaint does not allege any interference with Zoetis's or Heska's, or any other competitor's, ability to buy out a veterinarian's contract with IDEXX to encourage the veterinarian to switch its allegiances (similar to how cell phone companies and internet providers sometimes offer to pay a switching customer's early termination fees).

Notably, not a single veterinary practice is a plaintiff in this case.  This is true even though the number of veterinary practices in the United States that contract with IDEXX is alleged to be between "16,000 to 20,000."  *Id.* ¶ 11.  None of those thousands of veterinary practices is here

---

[3] Because the Complaint puts the program at issue and describes some aspects of it, but does not mention its central element, the following summary draws on the description in IDEXX's recent 10-K filing with the U.S. Securities & Exchange Commission.  *See* IDEXX Laboratories, Inc. 10-K, SEC (Dec. 31, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/874716/ 000087471622000007/idxx-20211231.htm.  The Complaint quotes 10-K language extensively in other respects, so it is properly considered on this motion to dismiss.  *See* Compl. ¶¶ 107 (quoting identical language in 2020 10-K), 147 (quoting 2021 10-K); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (reliance on the document is appropriate if "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim").  That said, the merits of this motion do not depend on whether the Court considers this additional background.

1  challenging IDEXX's contracts as in any way deceptive, anticompetitive, or otherwise improper.

2  Not only that.  In light of their 6-year terms, an average of 16.5% of veterinary practices who

3  contract with IDEXX have a contractual right to walk away every year without penalty.  *Id.* ¶ 123.

4  Yet IDEXX enjoys a retention rate of 96%, a reflection of its "extraordinary customer loyalty."

5  *Id.* ¶ 125.

6          Likewise, none of IDEXX's competitors is a plaintiff in the current case.  None of them is

7  here challenging IDEXX's competitive conduct in winning the business of veterinarians.  To the

8  contrary, as already noted, IDEXX's competitors use a similar business model, reinforcing that the

9  structure is beneficial in pro-competitively meeting the needs of veterinary practices.  IDEXX's

10  competitors also aggressively compete in other portions of the veterinary space.  Zoetis, a former

11  Pfizer subsidiary, views the business of supporting veterinary practices as sufficiently competitive

12  that it recently invested $2 billion to grow its business in the area.  *Id.* ¶¶ 128–129.  (By contrast,

13  according to the Complaint, IDEXX's total revenues for its Companion Animal Group that is

14  relevant here were "$2.38 Billion in 2020 and $2.88 Billion in 2021."  *Id.* ¶ 56.)

15      **C.      Plaintiffs Are Pet Owners Who Do Not Purchase IDEXX Products.**

16          Plaintiffs are 22 pet owners in 15 states.  *Id.* ¶¶ 24–45.  Pet owners do not buy or use

17  IDEXX diagnostic products.  None of these pet owners is alleged to have ever had a contract with

18  IDEXX or to have had any dealings whatsoever with IDEXX.  *Id.* ¶ 17.  None of the Plaintiffs is

19  alleged to have any experience setting up, equipping, running, or maintaining a veterinary

20  practice.  None of the Plaintiffs is alleged to have any experience or insight into what types of

21  contracts for POC Diagnostic Products best meet the needs or support the growth of veterinary

22  practices or the ability of veterinary practices to afford having expensive diagnostic equipment on-

23  site.  None of the Plaintiffs is alleged to have any insight whatsoever into the tradeoffs

24  veterinarians make between paying up front for diagnostic testing products or entering into

25  agreements over time, or anything else about the relationship between IDEXX and any veterinary

26  practice.  Nor are any of the Plaintiffs alleged to have any experience or insight into the

27  trustworthiness, quality, or value of the products and services that IDEXX's competitors offer to

28  veterinary practices, and under what terms.

**D.      Plaintiffs' Complaints Center On The Relationship Between IDEXX And Veterinary Practices In Which Plaintiffs Do Not Participate.**

As just noted, the Plaintiffs here are pet owners, not veterinarians or IDEXX competitors. Nevertheless, the centerpieces of Plaintiffs' challenge here are the following alleged practical impacts on veterinarians of various terms to which some veterinarians have agreed in choosing to contract with IDEXX:

- According to the Plaintiff pet owners, veterinarians are in some manner stymied by the procedure for giving notice to IDEXX in the event that they do not want to renew a contract.  *Id.* ¶ 122.

- According to the Plaintiff pet owners, it is too expensive for some unspecified number of veterinarians to meet or pay for their volume commitments earlier than the end of their contract period, or for some again unspecified number of veterinarians, at the end of their contract period, so the affected veterinarians find it economically difficult to switch to a competing supplier of POC Diagnostic Products.  *Id.* ¶¶ 102, 105–107, 115.

- According to the Plaintiff pet owners, because the volume purchases to which some veterinarians agree are affected by the veterinarians' previous spending levels, an unspecified number of veterinarians find it difficult to utilize a competitor's POC Diagnostic Products during the terms of their IDEXX contracts.  *Id.* ¶ 100.

- According to the Plaintiff pet owners, some unspecified number of veterinarians agree to unrealistic volume purchase commitments, which they then have difficulty satisfying, and which then make it financially difficult for them to switch to a competitor rather than renegotiate and extend their IDEXX contracts.  *Id.* ¶¶ 7, 108, 114.

- Finally, the Plaintiff pet owners speculate that veterinarians who purchase from IDEXX pursuant to a contract (which is not required) may fear they will become involved in litigation if they decide to switch to another diagnostics provider.  *Id.* ¶¶ 110–11.

**E.      Plaintiffs' Allegations Of Injury Are Conclusory.**

The Complaint alleges that, when Plaintiffs pay for veterinarians to diagnose and treat their pets, they "indirectly" purchase the POC Diagnostic Products that veterinarians bought at "premium" prices and use "to treat family pets".  *Id.* ¶¶ 1, 146, 151.  The Complaint then alleges that veterinarians pass along "all or most of the overcharge" to pet owners when the "veterinary practices use [the POC Diagnostic Products] to treat family pets."  *Id.* at 2; *id.* ¶¶ 148–149.  (At a couple of points the Complaint alleges that veterinary practices "resell" IDEXX products to pet owners, *id.* ¶ 17, and that Plaintiffs "purchase" them, *id.* ¶¶ 24–45, but the Complaint as a whole makes clear that "POC Diagnostic Products are designed for in-clinic testing" by veterinarians, *id.*

1   ¶ 65; Plaintiffs do not actually purchase or use these POC Diagnostic Products themselves.

2   Veterinarians do.)

3          The Complaint asserts 43 claims.  Claims 1 and 2 seek declaratory and injunctive relief

4   under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  Compl. ¶¶ 164–193.  Claims 3–28

5   seek damages and other relief under the antitrust laws of 26 states.  *Id.* ¶¶ 194–394.  Claims 29–43

6   assert claims under the consumer-protection laws of 14 states.  *Id.* ¶¶ 395–552.  Each of the claims

7   is based on the same challenged conduct.

8   **III.    Argument**

9          To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must plead facts showing

10   that their "right to relief [rises] above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

11   544, 555 (2007).  Plaintiffs must show "more than a sheer possibility that a defendant has acted

12   unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Allegations that are "no more than

13   conclusions are not entitled to the assumption of truth." *Id.* at 679.  Attention to this standard of

14   pleading in antitrust cases is critical, where discovery is onerous, the line between competitive and

15   anticompetitive conduct is narrow, the possibility of antitrust litigation chilling competitive

16   conduct is high, and the prospect of onerous discovery "gives the plaintiff the opportunity to extort

17   large settlements even where he does not have much of a case."  *In re Dynamic Random Access*

18   *Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 47 (9th Cir. 2022) (dismissing

19   antitrust claim under rule 12(b)(6)); *see also Twombly*, 550 U.S. at 557, 560.

20          **A.      Plaintiffs' Federal Claims Fail Because Plaintiffs Lack Antitrust Standing.**

21          The Plaintiffs here are all pet owners, not veterinarians.  As such Plaintiffs have no

22   relationship with IDEXX.  They are not parties to the contracts between veterinarians and IDEXX

23   for POC Diagnostic Products, and they do not compete with IDEXX in the POC Diagnostic

24   Products market segment.  They therefore lack antitrust standing to bring this antitrust challenge

25   based upon how the contracts purportedly affect veterinarians.

26          "Antitrust standing" is a required element of claims asserted under sections 1 and 2 of the

27   Sherman Act.  *See City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 (9th Cir. 2021)

28   (dismissing section 1 claim for lack of antitrust standing); *Somers v. Apple, Inc.*, 729 F.3d 953,

963–64 (9th Cir. 2013) (dismissing section 2 claim for lack of antitrust standing).  An antitrust

standing requirement applies not just to damages claims, but also to claims for injunctive relief.

*Feitelson v. Google, Inc.*, 80 F. Supp. 3d 1019, 1027 (N.D. Cal. 2015).  Antitrust standing is also a

required element of claims under state antitrust laws.  *See infra* at pp. 16–20; *see, e.g.*, *Cellular*

*Plus, Inc. v. Superior Ct.*, 14 Cal. App. 4th 1224, 1233 (1993) (under California's Cartwright Act,

plaintiffs must have antitrust standing).

　　　　"[A]ntitrust standing is distinct from Article III standing" because a plaintiff may not be

the "proper party to bring a private antitrust action" even if she can allege an injury-in-fact for

purposes of Article III.  *Jones v. Micron Tech., Inc.*, 400 F. Supp. 3d 897, 911 (N.D. Cal. 2019).

The distinct requirement of antitrust standing reflects the fact that although anticompetitive

conduct can have ripple effects in the economy, it would not be appropriate to permit antitrust

claims to be brought by everyone who can allege some impact from an alleged antitrust violation.

The concept of "antitrust standing" is meant to address whether the particular plaintiff is the most

appropriate party to assert an antitrust claim—or whether there are one or more parties who were

more immediately impacted by the conduct at issue and are better suited to bring any challenge to

that conduct.  *See generally AGC*, 459 U.S. at 519.

　　　　Under the Supreme Court's decision in *AGC*, courts assess Sherman Act antitrust standing

based on the following five factors: "(1) the nature of the plaintiff's alleged injury; . . . (2) the

directness of the injury; (3) the speculative nature of the harm; (4) the risk of duplicative recovery;

and (5) the complexity in apportioning damages."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,

190 F.3d 1051, 1054 (9th Cir. 1999).  The test for antitrust standing under relevant state laws is

analogous, as will be discussed further below.

　　　　Because Plaintiffs lack antitrust standing under the first three factors, their Sherman Act

claims for injunctive and declaratory relief cannot proceed.  As for the fourth and fifth factors,

Plaintiffs' Sherman Act claims do not seek damages because, under federal antitrust law, a

plaintiff that has not purchased the product at issue directly from the alleged violator of the

antitrust laws lacks antitrust standing to sue for damages.  *See Illinois Brick Co. v. Illinois*, 431

U.S. 720 (1977).  Thus, the fourth and fifth factors pertaining to damages do not apply to

Plaintiffs' Sherman Act claims.  *See Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, 2015 WL 4755335, at *16 (N.D. Cal. Aug. 11, 2015).  However, because Plaintiffs do seek damages for their state law claims, the damages factors apply to those claims, which also should be dismissed for lack of antitrust standing as discussed below.

### 1. *Plaintiffs Lack Antitrust Standing Because They Do Not Participate In The Relevant Market.*

The "first factor—antitrust injury—is mandatory."  *City of Oakland*, 20 F.4th at 456.  A plaintiff has suffered an "antitrust injury" only if they are "a participant in the same market" as the defendant.  *Somers*, 729 F.3d at 963.  "Parties whose injuries . . . are experienced in another market" are too remote from the conduct at issue to have suffered an antitrust injury.  *Feitelson*, 80 F. Supp. 3d at 1027–28 (citing *Am. Ad. Mgmt, Inc.*, 190 F.3d at 1057).

The alleged market in which IDEXX participates is the market for sale of POC Diagnostic Products to veterinarians.  Plaintiffs do not participate in that alleged market.  Plaintiffs bring their pets to veterinarians for animal health care services, including wellness check-ups, diagnosis and treatment.  They participate in the market for veterinary services, not the market for diagnostic equipment and supplies that veterinarians use to provide health care services to Plaintiffs' pets.  For example, Plaintiffs do not purchase IDEXX benchtop analyzers.  Those machines cost more than $10,000, last many years, and require "upkeep," staff training, and special software.  Compl. ¶¶ 10, 103.  Nor do Plaintiffs purchase or use IDEXX consumables, which "must be used" with the analyzers that Plaintiffs neither own nor use.  *Id.* ¶¶ 13, 57.  Likewise, the rapid test kits that IDEXX sells to veterinarians are for veterinarians to "perform" tests "in-house"—that is, for "in-office testing" (*id.* ¶ 1, 2, 66) at the point-of-care, where the veterinarians and their staff can draw samples, run the tests, and use the information learned combined with other information from examining the pet itself to provide diagnoses—not for consumers to use at home like a home pregnancy test or a home COVID test.  *Id.*

Plaintiffs therefore lack antitrust standing.  The Ninth Circuit addressed similar facts in *Eagle*, 812 F.2d at 538, where fishing boat employees brought an antitrust challenge to their employer's alleged conspiracy with fish-market vendors to fix the price at which the vendors

1    would resell fish.  The fishing boat employees alleged that this conspiracy resulted in their wages

2    being depressed.  *Id.* at 539.  The Ninth Circuit held that the boat employees lacked antitrust

3    standing to challenge the purported conspiracy, and that the proper plaintiffs would be competing

4    fishing boat owners or those who purchase the fish directly from the vendor co-conspirators.  *Id.* at

5    542.  The boat employees, by contrast, did not participate in the market for purchase and sale of

6    fish, which was the market in which the alleged conspiracy operated.  *Id.* at 543.

7            Similarly in *Feitelson*, cell-phone users brought an antitrust challenge to Google's

8    agreements with the manufacturers of Android phones, on the basis that it was anticompetitive for

9    the agreements to require that the manufacturers make Google Search the default search engine on

10   the phones.  80 F. Supp. 3d at 1027–28.  Plaintiffs claimed that this alleged anticompetitive

11   conduct resulted in higher retail prices for Android phones.  *Id.*  The district court dismissed the

12   cell phone owners' antitrust challenge for lack of antitrust standing.  *Id.*  The court held that the

13   market in which the allegedly improper conduct occurred was the market for Internet search.  *Id.*

14   Consumers challenging the price they paid for cell phones were not part of that market.  *Id.*  They

15   were allegedly harmed in the market for Android phones, not in the market for Internet search.  *Id.*

16   The same is true here—the Plaintiff pet owners were allegedly harmed in the market for veterinary

17   services, not in the alleged market for POC Diagnostic Products.

18           It changes nothing that Plaintiffs have scattered conclusory allegations in the Complaint to

19   the effect that they "purchased" IDEXX POC Diagnostic Products; the Complaint's specific

20   allegations make clear the actual nature of the situation, and that is what matters.  In *Salveson v.*

21   *JP Morgan Chase & Co.*, 166 F. Supp. 3d 242, 260–64 (E.D.N.Y. 2016), the court held that credit

22   card users lacked antitrust standing to bring an antitrust challenge to the "interchange fees"

23   charged by the card-issuing banks to the merchants from whom the credit card users made

24   purchases.  The credit card users were participants in the payment card market, the court

25   explained, whereas the challenged conduct was between the card issuing banks and the merchants.

26   *Id.* at 261–62.  It did not matter that the Complaint made conclusory allegations that credit card

27   users "paid" the interchange fee because the bank deducted the fee before it sent the funds for the

28   user's purchase to the merchant.  *Id.* at 261.  The same is true here.  IDEXX's alleged "premium

1  pricing" relates to its sale of POC Diagnostic Products to veterinarians.  Compl. ¶ 146.  The

2  Complaint's specific allegations are clear that it is the veterinarians who are the parties to those

3  transactions, not the Plaintiff pet owners.  Plaintiffs cannot evade the antitrust standing

4  requirement by having their Complaint "blur the definition of the relevant market." *Salveson*, 166

5  F. Supp. 3d at 260.

6       **2.    *The "Exceedingly Narrow" Exception For Injuries Occurring In***

7            ***"Inextricably Intertwined" Markets Does Not Apply.***

8        Plaintiffs cannot show they have antitrust standing based on the "inextricably intertwined"

9  exception to the market-participant rule.  That exception provides, under circumstances not present

10  here, that certain plaintiffs have antitrust standing when their claimed injuries occur in markets

11  that are "inextricably intertwined" with the relevant market. *Feitelson*, 80 F. Supp. 3d at 1027–29.

12  However, the exception is "exceedingly narrow." *Id.*  It applies only when "injuring the plaintiff

13  is a necessary part of the [alleged] anticompetitive scheme." *Id.* (citing *Exhibitors' Serv., Inc. v.*

14  *Am. Multi-Cinema, Inc.*, 788 F.2d 574, 580 (9th Cir. 1986)).  Stated differently, for the exception

15  to apply, the plaintiff must be an "essential participant" in the alleged scheme, without which the

16  scheme could not succeed. *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 745–46 (9th Cir. 1984).

17        Plaintiffs' claims do not fit into this narrow exception.  The heart of the alleged

18  "anticompetitive scheme" here is that IDEXX's contracting practices allegedly cause veterinarians

19  not to use competitors' POC Diagnostic Products.  Meanwhile, Plaintiffs' claimed injury is that

20  they allegedly paid veterinarians too much to run tests and diagnose their pets.  Compl. ¶ 149.

21  That alleged injury is not a "necessary part" of the alleged scheme.  Nothing in IDEXX's contracts

22  with veterinarians is alleged to require veterinarians to charge pet owners a certain amount for

23  diagnoses, or even to contemplate what veterinarians might decide to charge to run and interpret

24  diagnostic tests.  Nor are Plaintiffs essential participants in the alleged scheme.  The Plaintiff pet

25  owners were not involved in, and had no need to be involved in, developing or implementing the

26  programs or the contractual terms that IDEXX offers to veterinarians.

27        Because they do not meet the "inextricably intertwined" exception, Plaintiffs cannot avoid

28  the requirement that, for them to have antitrust standing, they must be participants in the relevant

1   market.  In *Feitelson*, for example, the court held that the plaintiff cell phone users did not have

2   antitrust standing under the "inextricably intertwined" exception.  80 F. Supp. 3d at 1028.  The

3   court explained that the plaintiffs' alleged injury of paying too much for Android phones was not a

4   "necessary means" by which Google was carrying out its allegedly anticompetitive scheme to

5   monopolize the Internet search market.  *Id.*  The situation here is similar.  The alleged injury of

6   overpaying for veterinary services is not a "necessary means" by which IDEXX is supposedly

7   carrying out a scheme to allegedly force veterinarians not to buy POC Diagnostic Products from

8   its competitors.

9           This is not a case in which the plaintiff purchased a device containing a component part

10  that was allegedly subject to a price-fixing conspiracy.  In such cases, some courts have held that

11  the plaintiff had antitrust standing because the market for the device is "inextricably intertwined"

12  with the market for the component part.  *See, e.g.*, *In re Flash Memory Antitrust Litig.*, 643 F.

13  Supp. 2d 1133, 1154 (N.D. Cal. 2009) (alleged conspiracy between flash memory manufacturers);

14  *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *12–13 (N.D. Cal. Oct. 2, 2014)

15  (alleged conspiracy between battery-cell manufacturers).

16          Here, rather than purchasing either POC Diagnostic Products themselves or other products

17  containing them, Plaintiffs purchase only veterinary services—and they purchase those services

18  from veterinarians, not from IDEXX.  Thus, like in *Feitelson* and *Salveson*, Plaintiffs do not

19  participate in the relevant market, even indirectly.  Further, the supposed pricing effect on

20  IDEXX's products is also less direct than in the cases involving price-fixing of component parts.

21  There is no allegation of a price fixing conspiracy here, nor could there be.  There is an allegation

22  only that the challenged contractual provisions have affected the pricing of IDEXX's products.

23          **3.      *Veterinarians—Not Pet Owners—Would Be The Natural Plaintiffs To***

24                  ***Litigate Any Issues Regarding Their Contracts With IDEXX.***

25          Because the first *AGC* factor must be satisfied for antitrust standing to exist, Plaintiffs'

26  non-participation in the relevant market is fatal alone to their Sherman Act claims.  But even if it

27  were not, Plaintiffs' claims also fail under the second *AGC* factor.  That factor—directness—looks

28  to how directly connected the plaintiff is to the challenged conduct.  *City of Oakland*, 20 F.4th at

458.  The plaintiff's alleged injury cannot be so "derivative and indirect" or "secondary, consequential, and remote" that other parties more directly affected by the challenged conduct would be more appropriate plaintiffs.  *Id.*  If there are such other parties, the plaintiff lacks antitrust standing.  *See id.* at 459 (no antitrust standing where "more direct victims" could have filed an antitrust suit).

Here, if any issues exist with IDEXX's contracts with veterinarians, the veterinarians are the more directly affected and appropriate parties to litigate them.  Plaintiffs speculate that some unspecified percentage of veterinarians might find it economically difficult to switch to IDEXX competitors' products for a series of reasons relating to their contracts with IDEXX.  *See supra* at p. 7.  But the natural parties to litigate whether these inferences are justified would be the veterinarians themselves.  Only the veterinarians have actual knowledge of the practical effects of the contracts they signed.  The Plaintiff pet owners are mere interlopers with no relationship to IDEXX.  Litigation over the practical effect of IDEXX's veterinarian contracts without the veterinarians as parties would be like the proverbial production of *Hamlet* without the prince.

Because veterinarians are more appropriate plaintiffs to litigate the claims here, Plaintiffs lack antitrust standing.  In *Eagle*, for example, the court explained that the vessel owners were much more directly connected to any harm that would have resulted from the alleged conspiracy to fix prices in the fish market, and so would be the more appropriate plaintiffs.  812 F.2d at 542.  And in *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 223–24 (S.D.N.Y. 2019), the court likewise held that the plaintiffs lacked antitrust standing because other parties would be more appropriate plaintiffs.  The plaintiffs in *Keurig* were coffee drinkers who purchased "K-cups" from retailers.  *Id.* at 209.  They alleged that contracts between Keurig and distributors and retailers caused the distributors and retailers to pay higher prices for K-cups by unfairly excluding Keurig's competitors from the market.  *Id.* at 214–16.  The court held that the plaintiffs lacked antitrust standing to make these allegations because there were "alternative enforcers"—the distributors and retailers who signed the contracts—who would be much better positioned to challenge any issues with those contracts.  *Id.* at 223.  So too here.  The

MOTION TO DISMISS

1  veterinarians who signed the contracts in question would be the natural parties to challenge any

2  issues with how veterinarians are affected by the contracts, if such issues exist.

3            **4.    *Plaintiffs Lack Antitrust Standing Because Their Alleged Injuries Are***

4                   ***Speculative.***

5            Plaintiffs also lack antitrust standing under the third *AGC* factor because their claimed

6  injuries are speculative.  Under the third factor—the speculative nature of the harm—a plaintiff

7  lacks antitrust standing when its injuries "may have been produced by independent factors" other

8  than the challenged conduct.  *Eagle*, 812 F.2d at 542.  *Eagle* for example explained that "several

9  independent factors" other than fish prices could have affected the fishing boat employees' wages,

10  including how much their employer decided to allocate to wages out of its overall budget.  *Id.*

11  Similarly, *Keurig* reasoned that the plaintiffs' claimed injury of paying too much for K-cups could

12  also have been caused "by factors independent from any alleged overcharge," such as "costs for

13  transportation, handling, [or] storage."  383 F. Supp. 3d at 224.

14          Likewise here, a host of factors independent from the alleged difficulty veterinarians face

15  in switching to IDEXX's competitors could easily explain Plaintiffs' claimed injuries.

16  Veterinarians themselves decide what price to charge pet owners for their services.  Numerous

17  factors could influence that pricing, including, for example, the size of a veterinarian's practice,

18  the median income of customers, the labor costs for technicians, the level of competition from

19  other veterinarians, corporate consolidation in the veterinary practice industry, the extent to which

20  pet insurance is present, or simply a veterinarian's individual decision about what the market will

21  bear or what the veterinarian deems appropriate.

22          Indeed, it is even clearer here than in *Keurig* that Plaintiffs' claimed injuries are

23  speculative because the Plaintiffs here are not even purchasers of the products at issue.  At least in

24  *Keurig*, the plaintiffs could legitimately claim they purchased at retail the very same K-cups that

25  the retailer had purchased from a wholesaler.  Here, in contrast, Plaintiffs do not buy IDEXX

26  products.  They purchase veterinarians' services in diagnosing and treating their pets.  IDEXX

27  products are used by the veterinarians in providing that service, but the IDEXX products are not

28  sold to the Plaintiffs—and a pet owner cannot pick and choose which diagnostic equipment her

veterinarian will use, any more than a medical patient can choose what brand stethoscope is being used, or whether her doctor will use a particular company's machine for her MRI.  As a result, many more factors than in *Keurig* could have influenced—or entirely dictated—the price Plaintiffs paid.  Even if some veterinarians choose to charge for a testing service performed at the point-of-care by line item, naming the test, that does not change the fact that veterinarians are providing a testing service and not reselling the products they purchased from IDEXX.

It is not sufficient that the Complaint articulates a conclusory chain of causation, alleging that IDEXX charges premium prices to veterinarians, who pass along "all or most of the overcharge" to Plaintiffs by selling them POC Diagnostic Products "in the same form in which they purchased them from IDEXX" along "a traceable physical chain" from IDEXX to the Plaintiffs.  Compl. ¶¶ 148–149.  In *Keurig*, the plaintiffs also made a generalized allegation that the "distribution channel for Keurig K-Cups [was] not complex" and that "overcharges were passed on" to the plaintiffs.  383 F. Supp. 3d at 224.  The court nevertheless found no antitrust standing, explaining that the Complaint failed to provide sufficient factual detail supporting the allegation, leaving "numerous questions unanswered."  *Id.*  Here, the only specific factual details that the Complaint provides actually undercut the conclusory assertion of a chain of causation because those factual details show that pet owners do not buy IDEXX's products, but rather buy only their veterinarians' services.  *See supra* at p. 10.

> **B.     Plaintiffs' State Law Claims Fail Because Plaintiffs Lack Antitrust Standing.**
>
> > **1.     *The State Law Antitrust Claims Fail For Lack Of Antitrust Standing.***

Plaintiffs' lack of antitrust standing is even more pronounced for their claims seeking damages under the antitrust laws of 26 states.[4]  Compl. ¶¶ 194–394.  In addition to failing to satisfy the first three *AGC* factors, the state law antitrust claims (counts 3 through 28) also run afoul of the last two factors—the risk of duplicative recovery, and the complexity in apportioning

---

[4] These states are Arizona, California, the District of Columbia, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

damages.  *See Am. Ad Mgmt., Inc.*, 190 F.3d at 1054 (listing factors).  Plaintiffs "have not explained adequately how they intend to avoid duplicative recovery," given that the veterinarians would be naturally positioned to bring a follow-on challenge, if there were any issues with their contracts.  *See Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, 2014 WL 4774611, at *9 (N.D. Cal. Sept. 22, 2014) (plaintiffs lacked antitrust standing where risk of duplicative recovery was high).  And damages would be complex to apportion.  The proposed class includes "hundreds of thousands of persons," including entities who "provided reimbursement" for tests (a category that presumably includes pet insurance companies).  Compl. ¶¶ 151, 154.  The pet owners in the proposed class visited thousands of different veterinarians.  Those veterinarians vary greatly; their contracts with IDEXX are alleged to vary too.  Determining whether there was any overcharge for each specific veterinarian would itself be extremely difficult; determining whether it was passed down, and how much was passed down, for each and every plaintiff, would be close to impossible.

As discussed, Plaintiffs lack antitrust standing to bring their federal claims under *AGC*. Because *AGC* also applies to their state law claims, the Court should dismiss those claims, too.

As federal district courts throughout the country have held, the same *AGC* test that applies to federal claims also applies to state law antitrust claims.  *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 540–45 (N.D. Ill. 2019); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1093–96 (N.D. Cal. 2007).  State courts routinely rely on federal precedent in interpreting state antitrust laws, and many states—including the states at issue here—have "harmonization provisions" in statutes or under the common law expressly stating that federal law is persuasive in interpreting state antitrust law.  *See* Appx. A (listing harmonization provisions and case law for each state).

Two state supreme court cases illustrate the point.  In *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 198 (Iowa 2007), the Iowa Supreme Court adopted the *AGC* test under Iowa law, noting that Iowa courts have long looked to federal precedent in construing state antitrust law. The Nebraska Supreme Court in *Kanne v. Visa U.S.A., Inc.*, 723 N.W.2d 293, 297–300 (Neb. 2006), likewise adopted the *AGC* test under Nebraska law.  The court explained that the Nebraska

1    antitrust statute and the federal antitrust laws have a similar purpose, similar structure, and

2    incorporate similar antitrust standing principles.  *Id.*

3         The same rationales in these state supreme court decisions apply to the other states here

4    too.[5]  The state supreme courts of these other states have not yet been called upon to address the

5    issue, but the harmonization provisions and cases that follow federal precedent in each state are

6    strong evidence that their highest courts would adopt the *AGC* test, if given the opportunity to do

7    so.  *See* Appx. A.  Indeed, many state appellate and trial courts have expressly adopted the *AGC*

8    test, or applied factors consistent with the *AGC* test when assessing state law claims.[6]  *See id.*  A

9    New Mexico appellate court, for example, dismissed a claim for lack of antitrust standing under

10   the *AGC* test where the plaintiff did not participate in the relevant market.  *See Naas-Romero v.*

11   *Visa USA, Inc.*, 279 P.3d 772, 778 (N.M. Ct. App. 2012).  A California appellate court did the

12   same.  *See Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1816 (1995).  Under Ninth Circuit

13   precedent, a district court "must follow" such decisions "unless [it] finds convincing evidence that

14   the state's supreme court likely would not follow [them]."  *Ryman v. Sears, Roebuck & Co.*, 505

15   F.3d 993, 994 (9th Cir. 2007).  There is no such convincing evidence here.  As discussed above,

16   convincing evidence suggests just the opposite.

17        The Court should therefore apply the *AGC* test to Plaintiffs' state law antitrust claims and

18   dismiss them for lack of antitrust standing, just as the courts did in *In re Dealer Mgmt. Sys.*

19   *Antitrust Litig.*, 362 F. Supp. 3d at 540–41, and *In re Dynamic Random Access Memory (DRAM)*

20   *Antitrust Litig.*, 516 F. Supp. 2d at 1095.  To be sure, not every district court to which this issue

21

22   _____

[5] As discussed below, Minnesota is an exception; Minnesota does not apply the *AGC* test.  *Lorix v.*

23   *Crompton Corp.*, 736 N.W.2d 619, 632 (Minn. 2007).  Nonetheless, Minnesota does still have an
     antitrust standing requirement, and that requirement likewise is not satisfied here.  *See infra* at p.

24   19.

25   [6] In North Carolina, one intermediate appellate court held that the *AGC* test does not apply under
     state law.  *See Teague v. Bayer AG*, 671 S.E. 2d 550, 557 (N.C. Ct. App. 2009).  However, as *In re*

26   *Dealer Management Systems* explained, another North Carolina court applied a modified version
     of the *AGC* test to state-law claims, and that decision is both better reasoned than *Teague* and

27   more reflective of North Carolina law.  *See In Re Dealer Management Systems*, 362 F. Supp. 3d at
     541 n.15 (citing *Crouch v. Crompton Corp.*, 2004 WL 2414027 (N.C. Super. Oct. 28, 2004)).

28

1   has been presented has reached the same result.  *See, e.g.*, *In re Graphics Processing Units*

2   *Antitrust Litig.*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) (declining to apply the *AGC* test to

3   some state antitrust laws).  But the contrary cases were based on a reluctance to apply the *AGC*

4   test absent a "clearer directive" from state courts or legislatures that it should apply.  *Id.*  That

5   reluctance is not justified.  As the court explained in *In re Dynamic Random Access Memory*,

6   given the host of statutes and cases that construe state antitrust law in accordance with federal law,

7   courts should apply the *AGC* test to state-law antitrust claims unless there is a relevant state law

8   "holding directly to the contrary." 516 F. Supp. 2d at 1095.  Because there are no such laws here,

9   Plaintiffs do not have antitrust standing under *AGC* to assert their state law claims.

10      Furthermore, even for Minnesota, the one state that has declined at the supreme court level

11   to follow the *AGC* test, Plaintiffs' claim under state antitrust law still fails for lack of antitrust

12   standing.  When the Minnesota Supreme Court declined to apply *AGC*, it also recognized that

13   antitrust standing is an element of Minnesota law, requiring that the plaintiff (1) participates in the

14   relevant market; and (2) has not claimed an injury that is "remote" or "speculative."  *Lorix v.*

15   *Crompton Corp.*, 736 N.W.2d 619, 632 (Minn. 2007).  The Minnesota Supreme Court used a

16   previous case involving credit card holders who challenged interchange fees as "an example of an

17   injury that is most likely too remote and speculative to afford [antitrust] standing." *Id.*  There is

18   accordingly no basis to conclude that Minnesota, or any other state that might choose to adopt its

19   own antitrust standing framework, would find antitrust standing for the Plaintiff pet owners here.

20   Like the plaintiffs in the credit card cases, Plaintiffs do not participate in the relevant market, and

21   their alleged injuries are speculative.

22      For this same reason, the fact that the states here have chosen not to apply the narrow rule

23   of *Illinois Brick* (*see supra* at p. 9) does not change the analysis.  In declining to follow *Illinois*

24   *Brick*, these states have decided that plaintiffs who purchase the product at issue at a lower point in

25   the chain of distribution, rather than directly from the alleged antitrust violator, can have antitrust

26   standing to file suit for damages under state law.  But that does not mean these states would hold

27   that a plaintiff who does not purchase the product at all should be found to have antitrust standing.

28   Rather, like the Minnesota Supreme Court, each state's highest court would hold that plaintiffs

1   who purchase a separate service that is merely performed using the product that is allegedly priced

2   too high do not have antitrust standing because their claimed injuries are too speculative.

3          Indeed, these states' decisions not to follow the federal *Illinois Brick* rule underscore that

4   these states "are quite capable of rejecting federal antitrust law when they see fit to do so." *In re*

5   *Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d at 540–41. They have not seen fit to reject the

6   federal *AGC* test. "While at least 25 states enacted repealer statutes in response to *Illinois Brick*,"

7   none has taken "legislative action . . . expressly rejecting *AGC*." *In re Dairy Farmers of Am., Inc.*

8   *Cheese Antitrust Litig.*, 2015 WL 3988488, at *6 (N.D. Ill. June 29, 2015).

9          **2.      *Each Of The Consumer-Protection Claims Also Fails For Lack Of***

10                   ***Antitrust Standing.***

11         For the same reasons, each of Plaintiffs' consumer-protection claims (counts 29 through

12  43) also fails for lack of antitrust standing. Courts dismissing state law claims for lack of antitrust

13  standing typically dismiss corresponding consumer protection claims for the same reason. *See,*

14  *e.g.*, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *15–20 (N.D.

15  Ill. June 29, 2015). For example, courts applying the laws of California, Montana, Nebraska,

16  South Carolina, and Vermont have expressly held that a plaintiff who lacks antitrust standing may

17  not assert a consumer-protection claim under those states' laws. *See In re Wellpoint, Inc., Out-of-*

18  *Network UCR Rates Litig.,* 903 F. Supp. 2d 880, 927–28 (C.D. Cal. 2012) (California); *In re Static*

19  *Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5094289, at *4 (N.D. Cal. Dec. 8,

20  2010) (Montana); *Kanne*, 723 N.W.2d at 301 (2006) (Nebraska);*In re Aggrenox Antitrust Litig.*,

21  2016 WL 4204478, at *9 (D. Conn. Aug. 9, 2016) (South Carolina); *Fucile v. Visa U.S.A., Inc.*,

22  2004 WL 3030037, at *3 (Vt. Super. Ct. Dec. 27, 2004) (Vermont).

23         The doctrinal analysis in other states differs semantically but is the same in substance. For

24  instance, some courts hold that the same failure to satisfy the "directness" principle that results in

25  plaintiffs' lacking antitrust standing also results in plaintiffs' failing to satisfy the "causation"

26  element of state consumer-protection laws. That is because the "directness inquiry in antitrust-

27  standing law is predicated on the well-known concept of proximate causation." *In re Dairy*

28  *Farmers*, 2015 WL 3988488, at *17. Thus, if a plaintiff's claimed injuries are too remote or

speculative to confer antitrust standing, that also provides "grounds for dismissal for [the] state-law consumer protection claims." *Id.* at *20. For example, the court in *In re Dairy Farmers* dismissed North Carolina and Florida consumer-protection claims on the basis that the plaintiffs' claimed injuries were so remote and speculative that the allegations the defendant "caused" them were not plausible. *Id.* at *19–20. The causation requirement likewise exists under the consumer protection laws of Massachusetts, New Hampshire, and Nevada.[7] Relatedly, other states focus not on "causation" but on whether the plaintiff purchased the product at issue—if the plaintiff did not do so, its injuries are too remote and speculative to support a consumer protection claim. *See Oliver v. Am. Express Co.*, 2020 WL 2079510, at *18–19 (E.D.N.Y. Apr. 30, 2020) (dismissing New Mexico consumer-protection claim).

In sum, regardless of how the issue is doctrinally framed under any particular state's law, all of plaintiffs' consumer protection claims here fail because Plaintiffs have not purchased IDEXX products or services, and are not parties to the contracts that they challenge.

## C. The Court Should Alternatively Dismiss The Claims Under The Laws Of States Where No Named Plaintiff Resides For Lack Of Article III Standing.

Separate from the antitrust standing element of the relevant statutes, Article III of the United States Constitution imposes an additional "injury-in-fact" standing requirement for a federal court to exercise subject matter jurisdiction over any claim. *See supra* at p. 9. There is no Article III standing to "bring claims under the laws of states where no named plaintiff is located" or purchased the product at issue. *See In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 157–58 (E.D. Pa. 2009). Here, the 22 named plaintiffs reside in only 15 of the 31 states under whose laws the Complaint asserts claims. The claims under the laws of the other 16 states should alternatively be dismissed under Rule 12(b)(1) for lack of Article III standing because no plaintiff

---

[7] *See Hershenow v. Enter. Rent-A-Car Co. of Bos., Inc.*, 840 N.E.2d 526, 535 (Mass. 2006) (Massachusetts); *Presti v. Toyota Motor Sales U.S.A, Inc.*, 2018 WL 792035, at *5 (D. Mass. Feb. 8, 2018) (New Hampshire); *Guerra v. Dematic Corp*, 2020 WL 8831583, at *3 (D. Nev. Sept. 9, 2020) (Nevada).

1   resides or purchased any products at issue in any of those states.  *See* Appx. B; *Los Gatos*, 2014

2   4774611, at *4 (dismissing similar claims for lack of subject matter jurisdiction).[8]

3         Numerous courts have dismissed state-law antitrust claims in this circumstance.  For

4   instance, the court in *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1106–07 (N.D. Cal.

5   2007) dismissed state-law antitrust claims in 24 states when none of the 4 named plaintiffs resided

6   in any of those states.  Many other courts have done the same.  *See, e.g.*, *Pardini v. Unilever*

7   *United States, Inc.*, 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013); *Los Gatos*, 2014 WL 4774611,

8   at *4; *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *13 (N.D. Cal. Aug. 3,

9   2011); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1164 (N.D. Cal. 2009); *In re*

10  *Apple & AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1309 (N.D. Cal. 2008); *In re Graphics*

11  *Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007).

12        Courts dismiss these claims because Article III requires that named plaintiffs "allege and

13  show that they personally have been injured, not that injury has been suffered by other,

14  unidentified members of the class."  *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d at 1107

15  (quoting *Lewis v. Casey*, 518 U.S. 343, 347 (1996)).  As *In re Ditropan XL* explained, a named

16  plaintiff cannot show that she personally has been injured in a state in which she does not reside

17  and has purchased no products.  *Id.*  The Plaintiffs here did not visit veterinarians or pay for

18  testing in any of the 16 states at issue, so they did not suffer an Article III injury for purposes of

19  asserting claims under those states' laws.

20        **D.**    **Plaintiffs' Consumer Protection Claims Fail For Additional Reasons.**

21        In addition to all of the consumer protection claims failing for lack of antitrust standing (or

22  doctrines of similar import), certain consumer protection claims fail for additional reasons, as set

23  forth in the attached Appendix B.  Many fail because the Complaint does not and cannot allege

24  that IDEXX deceived or misled any customers.  *See* Appx. B.  Under Rhode Island law, for

25

26  _____

[8] In the Ninth Circuit, a district court should address "the issue of standing before it addresse[s]

27  the issue of class certification."  *Easter v. Am. W. Fin.,* 381 F.3d 948, 962 (9th Cir. 2004).  Thus, although some district courts have deferred consideration of this question until class certification,

28  *see Los Gatos*, 2014 WL 4774611, at *4 (discussing cases), that is not appropriate here.

1    example, "a finding of unfair competition must be predicated upon conduct on the part of the

2    respondent that reasonably tended to confuse and mislead the general public." *George v. George*

3    *F. Berkander, Inc.,* 169 A.2d 370, 371 (R.I. 1961).  Montana and Nevada consumer-protection

4    laws, and Utah's Consumer Sales Practices Act, are likewise limited to deceptive conduct.  *See*

5    *Matthews v. Berryman*, 637 P.2d 822, 826 (Mont. 1981) (Montana); *Sheet Metal Workers Local*

6    *441 Health & Welfare Plan v. GlaxoSmithKline, PLC,* 737 F. Supp. 2d 380, 417 (E.D. Pa. 2010)

7    (Nevada); *Reid v. LVNV Funding, LLC*, 2016 WL 247571, at *6 (D. Utah Jan. 20, 2016) (Utah).

8           Other states' laws are limited solely to situations involving deceptive or fraudulent conduct

9    in connection with *consumer* transactions.  *See Durell v. Sharp Healthcare*, 183 Cal. App. 4th

10   1350, 1366–67 (2010) (California); *Shaw v. Marriott Int'l, Inc*., 605 F.3d 1039, 1043 (D.C. Cir.

11   2010) (District of Columbia); *State v. Int'l Collection Serv*., 594 A.2d 426, 428 (Vt. 1991)

12   (Vermont).  Plaintiffs did not engage in any transactions with IDEXX.  This spells the end of their

13   claims under these statutes.  *See* Appx. B.

14          Certain consumer-protection claims also fail for varying reasons.  *See* Appx. B.  For

15   instance, Montana and South Carolina law preclude class claims for damages.  *See In re Generic*

16   *Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 843–44 (E.D. Pa. 2019).  Plaintiffs' Nevada

17   consumer-protection claim fails because that law "grants a cause of action only to elderly or

18   disabled persons."  *In re Wellbutrin XL*, 260 F.R.D. at 163.  And, Plaintiffs cannot assert a claim

19   under the Utah Unfair Practices Act because Plaintiffs do not compete with IDEXX.  *See Snap*

20   *Advances LLC v. SHG of Ill., LLC*, 2019 WL 7505555, at *2 (D. Utah Feb. 12, 2019).

21   **IV.   Conclusion**

22          For the reasons set forth above, the Court should dismiss all of the claims alleged in the

23   Complaint under Rule 12(b)(6) or Rule 12(b)(1).

24   DATED:  September 30, 2022              MUNGER, TOLLES & OLSON LLP

25                                          By:   _____
                                                        */s/ Stuart Senator*
26                                                STUART N. SENATOR
                                                  Attorneys for Defendants IDEXX Laboratories,
27                                                Inc. and IDEXX Distribution, Inc.

28

**APPENDIX A: STATE LAW ANTITRUST CLAIMS**
**CASES OR STATUTES ADOPTING FEDERAL ANTITRUST STANDARDS**
**OR USING FEDERAL LAW AS A GUIDE**

| State | Key Cases and Statutes |
|---|---|
| AZ | Ariz. Rev. Stat. Ann. § 44-1412;<br>*Wedgewood Inv. Corp. v. Int'l Harvester Co.*, 613 P.2d 620, 622–23 (Ariz. Ct. App. 1979) |
| CA | *Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr. 2d 337, 338 n.1 (Cal. App. 1995) |
| DC | D.C. Code § 28-4515;<br>*Peterson v. Visa USA, Inc.*, 2005 WL 1403761, at *4–6 (D.C. Super. Ct. Apr. 22, 2005) |
| IL | 740 Ill. Comp. Stat. 10/11;<br>*Cnty. of Cook v. Phillip Morris, Inc.*, 817 N.E.2d 1039, 1045–46 (Ill. App. Ct. 2004) |
| IA | *Southard v. Visa USA, Inc.*, 734 N.W.2d 192, 198–99 (Iowa 2007) |
| KS | Kan. Stat. Ann. § 50-163(b) |
| ME | *Knowles v. Visa U.S.A., Inc.*, 2004 WL 2475284, at *5 (Me. Super. Ct. Oct. 20, 2004)<br>*Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) |
| MD | Md. Code Ann. Com. Law § 11-202(a)(2);<br>*Waldorf Shopping Mall, Inc. v. Great Atl. & Pac. Tea Co.*, 1984 WL 15690, at *13–14 (Md. Cir. Ct. Feb. 16, 1984) |
| MI | Mich. Comp. Laws § 445.784(2) |
| MN | *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) |
| MS | *Harrah's Vicksburg Corp. v. Pennebaker*, 812 So.2d 163 (Miss. 2002) |
| MO | Mo. Ann. Stat. § 416.141;<br>*Ireland v. Microsoft Corp.*, 2001 WL 1868946, at *1 (Mo. Cir. Ct. Jan. 24, 2001) |
| NE | *Kanne v. Visa USA, Inc.*, 723 N.W.2d 293, 297–300 (Neb. 2006) |
| NV | Nev. Rev. Stat. Ann. § 598A.050 |
| NH | N.H. Rev. Stat. Ann. § 356:14 |
| NM | *Naas–Romero v. Visa USA, Inc.*, 279 P.3d 772, 778 (N.M. Ct. App. 2012) |
| NY | *Ho v. Visa USA, Inc.*, 16 A.D.3d 256, 257 (N.Y. App. Div. 2005) |
| NC | *Madison Cablevision, Inc. v. Morganton*, 386 S.E.2d 200, 213 (N.C. 1989);<br>*Crouch v. Crompton Corp.*, 2004 WL 2414027, at *18–19 (N.C. Super Ct. Oct. 28, 2004) |
| ND | *Beckler v. Visa U.S.A., Inc.*, 2004 WL 2115144, at *3 (N.D. Dist. Ct. Aug. 23, 2004) |
| OR | Or. Rev. Stat. § 646.715(2) |
| RI | *ERI Max Enterm't, Inc. v. Streisand*, 690 A.2d 1351, 1353 n.1 (1997) |
| SD | *Byre v. City of Chamberlain*, 362 N.W.2d 69, 74 (S.D. 1985) |
| TN | *Spahr v. Leegin Creative Leather Products, Inc.*, 2008 WL 3914461, at *13–14 (E.D. Tenn. Aug. 20, 2008) |
| UT | Utah Code Ann. § 76-10-3118 |
| WV | W. Va. Code Ann. § 47-18-16 |
| WI | *Strang v. Visa USA, Inc.*, 2005 WL 1403769, at *3–5 (Wis. Cir. Ct. Feb. 8, 2005) |

## APPENDIX B:
## BARRIERS TO STATE CONSUMER-PROTECTION CLAIMS

| Claim No. | State | No Antitrust Standing (Or Analogous Failure) (pp. 20-21) | No Named Plaintiff* (pp. 21-22) | No Deceptive Or Fraudulent Conduct (p. 22-23) | No Class Action For Damages (p. 23) | No Right Of Action (p. 23) |
|---|---|---|---|---|---|---|
| 29 | California | X | | X | | |
| 30 | District of Columbia | X | X | X | | |
| 31 | Florida | X | | | | |
| 32 | Massachusetts | X | | | | |
| 33 | Montana | X | X | X | X | |
| 34 | Nebraska | X | X | | | |
| 35 | Nevada | X | X | X | | X** |
| 36 | New Hampshire | X | X | | | |
| 37 | New Mexico | X | X | | | |
| 38 | North Carolina | X | X | | | |
| 39 | Rhode Island | X | | X | | |
| 40 | South Carolina | X | | | X | |
| 41 | Utah Consumer Sales Practices Act | X | | X | | |
| 42 | Utah Unfair Practices Act | X | | | | X*** |
| 43 | Vermont | X | X | X | | |
| **Only elderly or disabled plaintiffs may sue. | | | | | | |
| ***Only competitors of the alleged violator may sue. | | | | | | |

*The full list of states in which no named plaintiff resides includes: the District of Columbia, Iowa, Kansas, Maine, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, South Dakota, and Vermont.